*375
 
 Opinion
 

 KAUFMAN, J.
 

 The ultimate question presented by this case is whether the governing board of a “private” nonprofit hospital corporation may validly make a policy decision, based on its reasonable judgment that it is in the best interests of good patient care and sound administration of the hospital, to operate the hospital’s chronic renal hemodialysis facility on a “closed-staff” basis (i.e., by arranging for exclusive use and practical administration of the facility with a single group of nephrologists associated together in their practice of medicine and who devote all but an insubstantial proportion of their professional endeavors to the practice of nephrology at the hospital) or whether the hospital is compelled by law to operate that facility on an “open-staff” basis (i.e., permitting all qualified physicians to use the facility, each performing dialysis on his own patients), the judgment of its governing board to the contrary notwithstanding.
 

 The trial court granted the petition of Dr. Laurence Lewin for a peremptory writ of mandate commanding St. Joseph Hospital of Orange (hereafter hospital or St. Joseph), in effect, to operate its chronic hemodialysis facility on an “open-staff” basis. The court also appointed a referee to ascertain what, if any, monetary damages Dr. Lewin had suffered as a result of hospital’s operating the facility on a “closed-staff’ basis. Hospital appeals. We reverse the judgment with directions to the trial court to enter judgment for hospital.
 

 Facts
 

 Although some factual details will be included in our discussion of the several issues, we set forth at the outset the facts necessary to an understanding of the contentions.
 

 Renal hemodialysis may be performed either on an acute or a chronic basis.
 
 [1]
 
 The difference was explained by Dr. Lewin as follows: “An acute dialysis is done on a patient who presents a problem of acute renal failure who has not presented an acute need for dialysis before that first event. Often it is a condition which is recoverable and reversible, but not
 
 *376
 
 always.” “Chronic hemodialysis is a procedure that is required for a prolonged period of time, usually lifetime, to sustain a patient’s life, and there—to amplify that, acute hemodialysis may begin on a patient and gradually merge into chronic hemodialysis when that patient fails to recover from the acute insult or has underlying kidney disease that prevents his recovery.” Chronic hemodialysis is usually performed on an out-patient basis.
 
 [2]
 
 Many hospitals find it advantageous to operate their chronic and acute hemodialysis facilities as separate “units.”
 

 St. Joseph Hospital of Orange is a “private”
 
 [3]
 
 hospital located in the City of Orange organized as a California nonprofit corporation. Along with a number of other hospitals
 
 [4]
 
 and “free-standing” organizations
 
 [5]
 
 located in Orange County, St. Joseph maintains and operates a renal hemodialysis facility consisting of both a chronic hemodialysis unit and an acute hemodialysis unit. The hemodialysis facility at St. Joseph was opened in May 1971 upon the initiation and under the medical direction of Drs. Miller and Gentile. From its inception and until shortly after October 16, 1975, the. hemodialysis facility at St. Joseph was operated on a “closed-staff” basis as to both the acute and chronic units. Shortly after October 16, 1975, apparently as a result of the hearing held in connection with Dr. Lewin’s request for hemodialysis privileges, hospital decided to
 
 *377
 
 operate its acute hemodialysis unit on an “open-staff” basis. However, it was determined that operation of the chronic hemodialysis unit should be continued on a “closed-staff” basis.
 

 Under the “closed-staff” arrangement, practical administration and operation of the chronic hemodialysis unit is exclusively in the hands of a group of four physicians associated in practice as the Nephrology Specialists Medical Group, Inc. (hereafter nephrology group). Drs. Miller and Gentile were the original members of the group. All four physicians are certified by the American Board of Internal Medicine in both internal medicine and nephrology, and all of them devote all but an insubstantial proportion of their respective professional endeavors to the practice of nephrology at St. Joseph Hospital.
 
 [6]
 
 These nephrologists are regarded as independent contractors, but there exists no formal contract between the group and hospital except for an oral understanding with respect to patient billings and the manner in which collected charges are allocated to professional and medico-administrative component, on the one hand, and hospital service component on the other. The relationship between the group and hospital is terminable at the will of either.
 

 Under the “closed-staff” arrangement the chronic hemodialysis unit is operated in two shifts from 8 a.m. to 10 p.m. each day. During these hours one or more members of the nephrology group is physically present on the unit or nearby. A member of the group is in attendance at all times any patient is undergoing dialysis except sometimes during the last 30 minutes of treatment of the last patient of the day. During dialysis, emergencies do occur from time to time with respect to which it is advantageous to have a qualified physician on the scene within a few minutes.
 

 The amount and cost of technical equipment and the number of trained, technical personnel (some 35 persons) required for operation of the unit are large in relation to the number of physicians required. The nephrology group supervises and trains the technical personnel. Morale
 
 *378
 
 and esprit de corps are important factors in delivering quality service. The members of the nephrology group meet daily to confer on operational and patient problems. They meet and confer with the nurses in the unit once a week and periodically with physicians and nurses from other departments such as pediatrics and radiology.
 

 Some 70 to 75 chronic dialysis patients are serviced by the unit. On each shift one member of the nephrology group makes rounds discussing problems with patients and making progress notes on the patients’ charts. Thus, all members of the group become acquainted with virtually all the patients and familiar with their special problems. Scheduling this number of patients for treatment presents a considerable problem, particularly in view of the fact that frequent changes in scheduling are required to accommodate patients and their needs.
 

 Dr. Lewin is a physician duly licensed to practice medicine in the State of California. Although he is not certified as a nephrologist, he performed a 1-year residency in internal medicine and a 22-month fellowship in renal medicine and limits his practice to nephrology and internal medicine. Neither his qualifications nor competence are in any way in issue in this case. He frequently utilizes renal hemodialysis in the care and treatment of his patients. His offices are located near Palm Harbor General Hospital where he performs a good deal of hemodialysis. He was the director of Palm Harbor’s hemodialysis facility in 1975. In addition to the privileges he exercises at Palm Harbor General Hospital, he has been granted hemodialysis privileges at a substantial number of other hospitals in’Orange County including Mercy General Hospital, Santa Ana-Tustin Community Hospital, the Orange County Medical Center, Fountain Valley, Pacifica, and St. Jude. He also exercises hemodialysis privileges at Nephron, Inc., a proprietary hemodialysis facility established by him and of which he is the medical director and principal owner. At a number of other Orange County hospitals having hemodialysis facilities, Dr. Lewin has not requested privileges. Dr. Lewin is a member of the inactive courtesy staff of St. Joseph’s medical staff, having been admitted to the staff in 1972, and has been granted “Class I Internal Medicine” clinical privileges.
 

 On March 25, 1975,
 
 [7]
 
 Dr. Lewin addressed a letter to the head of hospital’s department of medicine requesting hemodialysis privileges.
 
 *379
 
 This request was considered by the Medical Committee of the Medical Staff Association on April 4, 1975. The chairman of the committee asked the members of the committee if they knew of any reason why dialysis privileges should not be granted to Dr. Lewin. None were forthcoming and the medical committee forwarded its recommendation to the executive committee that Dr. Lewin be granted acute dialysis
 
 [8]
 
 No recommendation regarding chronic dialysis privileges was made, the committee having assumed that Dr. Lewin’s request was for acute dialysis privileges only.
 

 On June 2, 1975, the recommendation of the medical committee was reviewed by the executive committee. It was noted that the hemodialysis facility had always operated on a “closed-staff” basis. Because there had been no complaint from the medical staff as to the quality of care and because it was thought to be in the best interest of the hospital to continue to operate the hemodialysis facility on a “closed-staff” basis, the executive committee recommended to hospital’s board of trustees that Dr. Lewin’s application be denied. On June 26, 1975, the executive committee’s recommendation was approved by the board of trustees.
 

 On June 17, 1975, through his attorney, Dr. Lewin requested a hearing with respect to this decision. The chief of staff appointed a hearing committee which was instructed to evaluate the justification in terms of the medical reasons for maintaining a “closed-staff” operation. The hearing committee conducted a notice-and-comment-type hearing on September 22, 1975. Dr. Lewin was present and fully participated in the hearing, presenting his viewpoint that the hemodialysis facility should be operated on an “open-staff” basis. Dr. Gentile made a presentation outlining the “closed-staff” operation and giving numerous reasons why he felt that type of operation was preferable. Several other persons were heard from. At the conclusion of the hearing, the committee, apparently misunderstanding what it had been asked to do, unanimously decided to notify the executive committee that its decision to continue operating on a “closed-staff” basis was unjustified, “because Doctor Lewin was not
 
 *380
 
 given the opportunity to appear before any committee and present his side.” The committee’s minutes reflect it “wished to go on record as neither endorsing or rejecting the precept of a closed staff.”
 

 Accordingly, the Executive Committee of the Medical Staff Association decided it should conduct its own hearing, and such a hearing was held on October 16, 1975. A number of persons presented their views, including Dr. Lewin and Dr. Gentile. Again, the hearing was of the notice-and-comment type. Dr. Lewin and Dr. Gentile each made a statement, and each asked and answered questions. The competence and qualifications of Dr. Lewin were not in issue. The proceeding concerned itself with the relative merits of operating a hemodialysis facility in the “closed-staff” and “open-staff” manners.
 
 [9]
 
 At the conclusion of the hearing a motion was made to “open the staff for both acute and chronic dialysis.” The motion was defeated by a vote of five to three. A motion was then adopted by the same numerical vote “that the staff in dialysis remain closed in order to maintain the level of medical care now existing.” The final paragraph of the committee’s minutes indicates, “the fact that the nephrology group restricts their chronic dialysis activities to this hospital was instrumental in arriving at this decision.” The decision of the executive committee was approved by the board of trustees of hospital and Dr. Lewin was notified on October 22, 1975.
 

 Ten months later, on August 24, 1976, Dr. Lewin addressed a letter to hospital’s recently appointed administrator again requesting hemodialysis privileges, indicating his belief it was possible the previous administrator was in some way responsible for the 1975 denial of privileges and stating: “With the aid of my lawyer, I have assembled documentation from other Nephrologists and we are prepared to test the validity of the denial.” Hospital’s administrator replied by letter indicating he had reviewed the matter and found no reason for further action in view of the decision made following the executive committee hearing in 1975.
 

 On November 24, 1976, Dr. Lewin filed a petition for writ of mandate in the Orange County Superior Court. Among the more pertinent allegations are the following: Because of the limited dialysis facilities available in Orange County, Dr. Lewin requires the use of St. Joseph’s dialysis unit to care for his patients; he made application for chronic dialysis privileges, but after being afforded an administrative hearing, his request for chronic dialysis privileges was denied; it is and was “the legal
 
 *381
 
 duty of . . . hospital to refrain from interfering with [Dr. Lewin’s] legitimate practice of his profession”; “[hjospital and others have entered into an unlawful contract for the exclusive use of [hospital’s] hemodialysis unit to the exclusion of other qualified physicians, and said contract is in restraint of the lawful pursuit of [Dr. Lewin’s] medical practice”; “said unlawful contract interferes with the relationship between [Dr. Lewin] and his patients in that those patients who prefer to undergo hemodialysis at . . . [h]ospital must employ other physicians ... to do so, said other physicians being those who are beneficiaries of said unlawful contract”; he “has suffered damages reasonably believed to be in excess of $30,000.00 from the loss of income to the unavailability of hemodialysis facilities at . . . hospital, and will continue to suffer damage so long as [hospital] is permitted to unlawfully exclude him.”
 

 At trial the parties stipulated that the transcript of the executive committee hearing on October 16, 1975 and the depositions of Dr. Lewin and Dr. Calescivetta be received in evidence. Substantially without objection the court also admitted into evidence the minutes of the proceedings of the ad hoc hearing committee on September 22, 1975. Counsel for Dr. Lewin offered a number of declarations into evidence. Counsel for hospital objected to this being received on the ground that declarations do not constitute competent evidence in a trial and that, further, the declarations constituted hearsay. The court made no express ruling. However, it is a fair characterization of the transcript to say it appears pretty much to have been assumed by all that the objection would be sustained. There ensued a considerable discussion between the court and counsel as to the proper disposition of Dr. Lewin’s claim for damages. The result was an apparent understanding by all concerned that the claim for damages would be litigated at a later time. In view of the conclusions we' reach on other issues dispositive in the case, there is no necessity to burden this opinion with the details relating to this aspect of the case.
 

 The matter having been submitted, on June 17, 1977, the court issued an order granting Dr. Lewin’s petition for writ of mandate and ordering a reference of the issue of damages. In the order the court found “each and all of the allegations set forth in Paragraphs 1 to 16, inclusive, of the Petition ... for Writ of Mandate to be true.”
 
 [10]
 
 It
 
 *382
 
 further found “that the actions of the Hearing Committee of [hospital] and of the Executive Committee of [hospital] in denying to [Dr. Lewin] the right to use the chronic hemodialysis facilities of [hospital] for the treatment of his patients were unjustified, arbitrary and not supported by substantial evidence.” It concluded as a matter of law that a peremptory writ of mandate should issue commanding hospital to permit Dr. Lewin to use the chronic hemodialysis unit “upon the same terms and conditions applicable to other qualified physicians now using such facilities.”
 
 [11]
 
 It further concluded that the parties should be afforded an opportunity to present evidence “to prove or disprove whether [Dr. Lewin] has sustained any damage as a result of [hospital’s] actions in excluding him from the use of its chronic hemodialysis facilities” and appointed a referee to conduct an evidentiary hearing on that question. The order, which appears to have been prepared by the court, recites that there was “evidence in the form of various
 
 Declarations of individuals
 
 and Depositions, all of which are on file herein.” (Italics added.)
 

 Discussion of Contentions and Issues
 

 Nature and Scope of the Trial Court Proceedings
 

 The parties are in sharp disagreement as to the nature and scope of the trial court proceedings. Dr. Lewin contends the administrative hearing was adjudicatory in nature, that the proceeding is one for administrative mandamus (Code Civ. Proc., § 1094.5) in which the trial court was to review the adjudicatory decision of hospital, and that, since hospital’s adjudicatory decision affects a fundamental, vested right, namely Dr. Lewin’s right to practice his profession, “it appears clear that the trial court appropriately exercised it’s [sic] independent judgment in reaching [its] decision.” Hospital contends the administrative hearing and its decision was “quasi-legislative” in nature, that administrative mandamus is not appropriate to review quasi-legislative acts, that the proceeding is one for traditional mandate (Code Civ. Proc., § 1085) and that the trial court was limited to determining whether hospital’s decision was arbitrary, capricious or entirely lacking in evidentiary support or whether it failed to follow the procedure or give notice required by law. Hospital is correct.
 

 
 *383
 
 It is true, of course, that in
 
 Anton
 
 v.
 
 San Antonio Community Hosp.,
 
 19 Cal.3d 802 [140 Cal.Rptr. 442, 567 P.2d 1162], it was held that administrative mandate (Code Civ. Proc., § 1094.5) is appropriate to review quasi-judicial proceedings and determinations of nongovernmental agencies such as a nonprofit hospital corporation (19 Cal.3d at pp. 813-820) and that the trial court should exercise an independent judgment on the evidence in reviewing an adjudicatory decision of such an agency if it affects a fundamental, vested right (19 Cal.3d at pp. 820-825; accord:
 
 Strumsky
 
 v.
 
 San Diego County Employees Retirement Assn.,
 
 11 Cal.3d 28, 34, 44-45 [112 Cal.Rptr. 805, 520 P.2d 29];
 
 Bixby
 
 v.
 
 Pierno, 4
 
 Cal.3d 130, 144-147 [93 Cal.Rptr. 234, 481 P.2d 242]).
 
 [12]
 
 However, these principles have no application to quasi-legislative proceedings and determinations which are reviewed by traditional mandate (Code Civ. Proc., § 1085; see
 
 Strumsky
 
 v.
 
 San Diego County Employees Retirement Assn., supra,
 
 11 Cal.3d at p. 34, fn. 2;
 
 Wilson
 
 v.
 
 Hidden Valley Mun. Water Dist.,
 
 256 Cal.App.2d 271, 277-278 [63 Cal.Rptr. 889]; 5 Witkin, Cal. Procedure (2d ed. 1971) Extraordinary Writs, § 215, subd. (2), p. 3971) in which the inquiry by the trial court “ ‘is limited to an examination of the proceedings ... to determine whether [the] action [taken] has been arbitrary, capricious, or entirely lacking in evidentiary support or whether [the agency] has failed to follow the procedure and give the notices required by law.’ ”
 
 (Pitts
 
 v.
 
 Perluss,
 
 58 Cal.2d 824, 833 [27 Cal.Rptr. 19, 377 P.2d 83]; accord:
 
 Ray
 
 v.
 
 Parker,
 
 15 Cal.2d 275, 310-311 [101 P.2d 665];
 
 County of Orange
 
 v.
 
 Heim,
 
 30 Cal.App.3d 694, 719 [106 Cal.Rptr. 825];
 
 Wilson
 
 v.
 
 Hidden Valley Mun. Water Dist., supra,
 
 256 Cal.App.2d at p. 286;
 
 Brock
 
 v.
 
 Superior Court,
 
 109 Cal.App.2d 594, 601-605 [241 P.2d 283]; see
 
 Strumsky
 
 v.
 
 San Diego County Employees Retirement Assn., supra,
 
 11 Cal.3d at p. 34, fn. 2;
 
 Bixby
 
 v.
 
 Pierno, supra, 4
 
 Cal.3d at p. 137, fn. 2.)
 

 The hearing held by the executive committee on October 16, 1975, and the resulting decision of the executive committee and the board of trustees to continue operating the chronic hemodialysis unit on a “closed-staff” basis were clearly “quasi-legislative” in nature. “Generally speaking, a legislative action is the formulation of a rule to be applied to all future cases, while an adjudicatory act involves the actual application of such a rule to a specific set of existing facts.”
 
 (Strumsky
 
 v.
 
 *384
 

 San Diego County Employees Retirement Assn., supra,
 
 11 Cal.3d at p. 35, fn. 2;
 
 Anton
 
 v.
 
 San Antonio Community Hosp., supra,
 
 19 Cal.3d at p. 814, fn. 9; see also
 
 Wilson
 
 v.
 
 Hidden Valley Mun. Water Dist., supra,
 
 256 Cal.App.2d at pp. 279-280.) Neither the hearing nor the decision were concerned with the application of a rule to Dr. Lewin individually. Neither his character, qualifications or competence were in issue. Rather, the proceedings were concerned with whether hospital should abrogate or continue in force its “closed-staff” rule governing operation of a facility of the hospital, a rule applicable not only to Dr. Lewin but to all physicians including all members of hospital’s medical staff, other than the nephrology group, regardless of their presumed competence and qualification. What was involved was the formulation, or to be more precise, the retention of a rule of general application, not the application of a rule to a specific set of facts or a particular individual.
 

 The term “quasi-legislative” is, of course, more appropriately applied to the proceedings and decisions of a governmental agency than a “private,” nonprofit corporation. In respect to the latter, perhaps it is more appropriate to refer to its “quasi-legislative” proceedings and decisions as “rule-making” or “policy-making.” Nevertheless, we are confident the limited judicial review applicable to the quasi-legislative actions of a governmental administrative agency is also appropriately applied to judicial review of rule-making or policy-making actions of a nonprofit hospital corporation. In the first place, the propriety of judicial review of the rule-making or policy-making actions of such an entity is based in large part on the notion that its actions substantially affect the public interest and that it is not therefore entirely “private.” (See, e.g.,
 
 Pinsker
 
 v.
 
 Pacific Coast Soc. of Orthodontists, supra,
 
 1 Cal.3d at pp. 165, 166; see also fn. 3,
 
 ante,
 
 and other cases there cited.) Secondly, to the extent the scope of judicial review is limited as a matter of deference by the courts to the presumed expertise of administrative agencies in respect to matters within their jurisdiction (see, e.g.,
 
 Pitts
 
 v.
 
 Perluss, supra,
 
 58 Cal.2d at pp. 834-835;
 
 Ray v. Parker, supra,
 
 15 Cal.2d at pp. 310-311), the reason for the rule is fully applicable to a nonprofit hospital corporation. The operation and administration of a hospital involves a great deal of technical and specialized knowledge and experience, and the governing board of a hospital must be presumed to have at least as great an expertise in matters relating to operation and administration of the hospital as any governmental administrative agency with respect to matters committed to its authority. Third, to the extent the limited scope of judicial review may be attributable to the concept of separation of powers and judicial deference to a coordinate branch of government (see,
 
 *385
 
 e.g.,
 
 Brock
 
 v.
 
 Superior
 
 Court,
 
 supra,
 
 109 Cal.App.2d at p. 603), a similar deference is not inappropriate in respect to rule-making or policy-making actions of a “private,” nonprofit hospital corporation.
 
 (Blank
 
 v.
 
 Palo Alto-Stanford Hospital Center, supra,
 
 234 Cal.App.2d at p. 392; cf.,
 
 Pinsker
 
 v.
 
 Pacific Coast Society of Orthodontists, supra,
 
 12 Cal.3d at p. 558.) A managerial decision concerning operation of the hospital made rationally and in good faith by the board to which operation of the hospital is committed by law should not be countermanded by the courts unless it clearly appears it is unlawful or will seriously injure a significant public interest.
 

 Judges are untrained and courts ill-equipped for hospital administration, and it is neither possible nor desirable for the courts to act as supervening boards of directors for every nonprofit hospital corporation in the state. Paraphrasing the language of the court in
 
 Pinsker
 
 v.
 
 Pacific Coast Society of Orthodontists, supra,
 
 12 Cal.3d at page 558, quoting from
 
 Blende
 
 v.
 
 Maricopa County Medical Society
 
 (1964) 96 Ariz. 240 [393 P.2d 926, 930], in reviewing the rule-making or policy-making decisions of the governing board of a nonprofit hospital corporation, the court must guard against unduly interfering with the board’s autonomy by substituting judicial judgment for that of the board in an area where the competence of the court does not equal that of the board. (Accord:
 
 Blank
 
 v.
 
 Palo Alto-Stanford Hospital Center, supra,
 
 234 Cal.App.2d at p. 392; cf.
 
 Pitts
 
 v.
 
 Perluss, supra,
 
 58 Cal.2d at p. 835, including fn. 4 and cases there cited and quoted.)
 

 It is no mere coincidence that, even where mandate considerations do not affect the scope of review, it is held that a rule or policy decision of general application adopted by the governing authority of a hospital or professional society impinging upon the right of a physician to practice his or her profession fully will not be set aside by a court unless it is substantively irrational, unlawful or contrary to established public policy or procedurally unfair. (E.g.,
 
 Pinsker
 
 v.
 
 Pacific Coast Society of Orthodontists, supra,
 
 12 Cal.3d at pp. 550, 558;
 
 Ascherman
 
 v.
 
 Saint Francis Memorial Hosp.,
 
 45 Cal.App.3d 507, 511-512 [119 Cal.Rptr. 509] [mandate was sought, but the scope of review adopted was in no way based on mandate considerations]; cf.
 
 Blank
 
 v.
 
 Palo Alto-Stanford Hospital Center, supra,
 
 234 Cal.App.2d at p. 392.) This standard of judicial inquiry is substantially the same as that prescribed by the cases involving judicial review of quasi-legislative determinations of administrative agencies hereinabove set forth. Substantive irrationality is equivalent to “arbitrary, capricious, or entirely lacking in evidentiary support”; procedurally
 
 *386
 
 unfair is the same as “failed to follow the procedure and give the notices required by law.” Although the traditional formulation articulated in the mandate cases (e.g.,
 
 Pitts
 
 v.
 
 Perluss, supra,
 
 58 Cal.2d at p. 833;
 
 Ray
 
 v.
 
 Parker, supra,
 
 15 Cal.2d at pp. 310-311; see also other cases cited,
 
 ante)
 
 does not specifically include “unlawful or contrary to established public policy,” it cannot be doubted the mandate cases would authorize judicial intervention where administrative action was shown to be unlawful or indisputably contrary to established public policy.
 

 Accordingly, if the trial court in the case at bench exercised an independent judgment on the evidence as Dr. Lewin asserts, it erred. We do not know, of course, whether it did or not. Its finding that hospital’s decision to continue operating its chronic hemodialysis unit on a “closed-staff” basis was “unjustified, arbitrary and not supported by substantial evidence” suggests it did not purport to. In any event, since we have concluded that as to the ultimate questions, whether hospital’s decision was arbitrary, capricious or entirely lacking in evidentiary support or contrary to established public policy or unlawful or procedurally unfair, this court exercises essentially the same function as the trial court, review by this court will preclude any possibility of prejudice from any mistake by the trial court as to the proper scope of review.
 

 Scope of Review on Appeal
 

 In an administrative mandate proceeding in which the trial court has properly exercised its independent judgment on the evidence, the trial court’s factual determinations are conclusive on appeal if they are supported by substantial evidence.
 
 (Merrill
 
 v.
 
 Department of Motor Vehicles,
 
 71 Cal.2d 907, 915 [80 Cal.Rptr. 89, 458 P.2d 33];
 
 Moran
 
 v.
 
 Board of Medical Examiners,
 
 32 Cal.2d 301, 308 [196 P.2d 20]; see Cal. Administrative Mandamus (Cont.Ed.Bar 1966) § 15.25, pp. 280-281.) If the proper scope of review in the trial court was whether the administrative decision was supported by substantial evidence, the function of the appellate court on appeal is the same as that of the trial court, that is, it reviews the administrative decision to determine whether it is supported by substantial evidence.
 
 (Sunset Amusement Co.
 
 v.
 
 Board of Police Commissioners, 1
 
 Cal.3d 64, 76 [101 Cal.Rptr. 768, 496 P.2d 840];
 
 Bixby
 
 v.
 
 Pierno, supra, 4
 
 Cal.3d at p. 149;
 
 Merrill
 
 v.
 
 Department of Motor Vehicles, supra,
 
 71 Cal.2d at pp. 915-916; see Cal. Administrative Mandamus (Cont.Ed.Bar 1966) § 15.26, p. 281.) What then is the scope of review on appeal in a traditional mandate proceeding reviewing a quasi-legislative determination in which the trial court’s review was
 
 *387
 
 limited to determining whether the decision was arbitrary, capricious, entirely lacking in evidentiary support, contrary to established public policy or unlawful or procedurally unfair?
 

 There might be foundational matters of fact with respect to which the trial court’s findings would be conclusive on appeal if supported by substantial evidence.
 
 [13]
 
 However, the ultimate questions, whether the agency’s decision was arbitrary, capricious or entirely lacking in evidentiary support, contrary to established public policy or unlawful or procedurally unfair, are essentially questions of law. With respect to these questions the trial and appellate courts perform essentially the same function, and the conclusions of the trial court are not conclusive on appeal.
 
 (County of Orange
 
 v.
 
 Heim, supra,
 
 30 Cal.App.3d at p. 719; cf.
 
 Merrill
 
 v.
 
 Department of Motor Vehicles, supra,
 
 71 Cal.2d at p. 917; also cf.
 
 Pinsker
 
 v.
 
 Pacific Coast Society of Orthodontists, supra,
 
 12 Cal.3d at pp. 558-561, and
 
 Ascherman
 
 v.
 
 Saint Francis Memorial Hosp., supra,
 
 45 Cal.App.3d at pp. 512-514 [determinations of substantive rationality and procedural fairness as questions of law without discussion of the appellate court’s function.].)
 

 The Proceedings and Decisions Were Not Arbitrary, Capricious or Wholly Lacking in Evidentiary Support
 

 Before proceeding, it is appropriate we determine what evidence is to be considered.. Hospital asserts the trial court improvidently considered the declarations of several physicians and a nurse offered into evidence on behalf of Dr. Lewin and objected to by hospital on incompetency and hearsay grounds. We do not know whether, in fact, the trial court considered these declarations, although the recital in its order that the evidence consisted in part of “Declarations of individuals” suggests it did. If it did it erred. In the first place, the declarations are simply statements of the opinions of the declarants that “open-staff”
 
 *388
 
 operation of a hemodialysis facility is preferable to a “closed-staff” operation. That, of course, was the question confronting the executive committee and the board of trustees. The determination whether their decision was arbitrary, capricious or entirely lacking in evidentiary support must be determined on the basis of the “evidence” they considered, and any consideration by the court of these declarations executed long after hospital’s decision would have been improper.
 
 (Brock
 
 v.
 
 Superior Court, supra,
 
 109 Cal.App.2d at pp. 607, 608.) In addition, hospital’s objection to the court’s receiving these declarations in evidence on grounds of incompetency and hearsay were well taken. (Code Civ. Proc., § 2009; Evid. Code, § 1200.)
 

 However, since we have concluded the questions whether hospital’s decision was arbitrary, capricious, wholly lacking in evidentiary support, procedurally unfair, unlawful or contrary to established public policy, are questions of law appropriate for decision by this court, we shall not consider these declarations, and we may therefore ignore as harmless any error by the trial court in considering them.
 

 “[Wjhenever a private association is legally required to refrain from arbitrary action, the association’s action must be both substantively rational and procedurally fair.”
 
 (Pinsker
 
 v.
 
 Pacific Coast Society of Orthodontists, supra,
 
 12 Cal.3d at p. 550;
 
 Ascherman
 
 v.
 
 Saint Francis Memorial Hosp., supra,
 
 45 Cal.App.3d at pp. 511-512.) No claim is made, nor could one be, that hospital’s conduct was procedurally unfair. The doctrine of “fair procedure” has been developed in cases involving adjudicatory decisions (see
 
 Ezekial
 
 v.
 
 Winkley, supra,
 
 20 Cal.3d at pp. 271-273, and cases there cited;
 
 Pinsker
 
 v.
 
 Pacific Coast Society of Orthodontists, supra,
 
 12 Cal.3d at pp. 549-554) and we are not required in this case to decide whether notice and an opportunity to be heard must be afforded in respect to “rule making” or “policy making” decisions of general application. Here Dr. Lewin was afforded both notice and an opportunity to be heard. Although no argument is made with respect thereto, it was alleged in the petition for writ of mandate that Dr. Lewin’s letter to hospital’s new administrator dated August 24, 1976, constituted a request to reopen the hearing. However, assuming without deciding the propriety of such a request, the only showing of cause for reopening in Dr. Lewin’s letter was the following statement: “With the aid of my lawyer, I have assembled documentation from other Nephrologists and we are prepared to test the validity of the denial.” Presumably this statement had reference to the declarations discussed earlier which were simply cumulative of the opinion of Dr. Lewin that an “open-staff”
 
 *389
 
 operation would be preferable. Even assuming the initial hearing was required by law, hospital was certainly not required to reopen the hearing on such a showing 10 months after the conclusion of the hearing and its final decision.
 

 We turn then to the question whether hospital’s decision was substantively irrational, arbitrary, capricious or wholly lacking in evidentiary support. Decidedly, it was not. In the hearing before the executive committee the differing views as to the relative merits of “open-staff” and “closed-staff” operations were thoroughly heard and examined. We do not feel compelled to set forth in detail the “evidence” adduced at the hearing. Indeed, it would be difficult to do so, for the hearing in large part consisted of give-and-take discussion and questions and answers. Suffice it to say, the committee had before it statements of opinion from qualified persons that a “closed-staff” operation of the chronic hemodialysis unit was preferable to an “open-staff” operation both from the standpoint of hospital administration and patient care. It was indicated the “closed-staff” operation facilitates administration of the unit and supervision and training of nurses and other personnel and enhances rapport between physicians and other operating personnel, improving morale and esprit de corps. Further, the “closed-staff” operation provides assurance of the immediate availability of a nephrologist during the 14 hours a day the unit is operative and attendance of a nephrologist at all times dialysis is being administered to a patient. The “closed-staff” operation simplifies scheduling and permits more flexibility in scheduling thereby promoting convenience to patients and more efficient use of both equipment and personnel. Additionally, it was indicated the “closed-staff” operation is more economical and permits services to patients at a lower cost than can be provided with an “open-staff” operation.
 
 [14]
 
 The record also indicates that chronic hemodialysis facilities are operated on a “closed-staff” basis by a substantial number, perhaps a majority, of hospitals in the Southern California area.
 

 By contrast, it was indicated that opening the unit to all qualified physicians would tend to be disruptive in terms of administration
 
 [15]
 
 and
 
 *390
 
 scheduling, would tend to impede efficient use of equipment and personnel and would tend to place emphasis on the convenience of the physicians at the cost of patient convenience. It was indicated that in an “open-staff” operation it would not be economically feasible to have a nephrologist in attendance at all times dialysis was being administered to a patient and that physician availability .would be somewhat reduced. Dr. Lewin readily conceded he would be unable to attend all of the many conferences held under the present arrangement.
 

 Dr. Lewin did not deny that hospital’s hemodialysis operation on the “closed-staff” basis was excellent. In fact, its economical service and high quality were part of the reason he wanted to use the facility. He stated St. Joseph’s facility was the best in the county and he thought he could learn a great deal by practicing there. He further stated: “It’s an ideal arrangements [s/c], I don’t argue with it at all. On a very typical day, I put 90 miles on my car. I work very long hours but I think the end result of what I am achieving is quite comparable to the type of care that you offer your patients. I don’t think that is the issue. I think the issue is can you, on a Medical Staff, acknowledging that a person has the qualification to do the job, restrict his ability to do the job or limit his privileges because you are satisfied with the group that you have.” In essence, Dr. Lewin’s position was that excellent service can also be provided on an “open-staff” basis.
 

 Faced with what at most can be said to be conflicting views, the executive committee and board of trustees were required to make a policy decision as to which method of operating hospital’s chronic hemodialysis unit would provide the best patient care at the lowest cost consistent with sound hospital administration. These governing authorities of hospital decided the “closed-staff” method of operation was preferable. That decision was amply justified by the “evidence” and was substantively rational and not arbitrary, capricious or entirely without evidentiary support. As previously indicated, in reviewing a rule-making or policy-making decision of the governing board of a nonprofit hospital corporation, if the decision was substantively rational and the proceedings were fair, a court may not substitute its judgment for that of the governing board even if it disagrees with the board’s decision.
 
 (Pinsker
 
 v.
 
 Pacific Coast Society of Orthodontists, supra,
 
 12 Cal.3d at p. 558;
 
 Blank
 
 v.
 
 Palo Alto-Stanford Hospital Center, supra,
 
 234 Cal.App.2d at p. 392 [quoting
 
 Benell
 
 v.
 
 City of Virginia
 
 (1960) 258 Minn. 559 (104 N.W.2d 633, 636)];
 
 Pitts
 
 v.
 
 Perluss, supra,
 
 58 Cal.2d at p. 835, including fn. 4 and cases
 
 *391
 
 there cited and quoted.) In view of the record the only conclusion that can be reached is that the trial court substituted its judgment for that of hospital’s governing board. In so doing it erred.
 

 The Decision Was Not Unlawful or Contrary to Established Public Policy
 

 Except to the extent such a claim may be included in Dr. Lewin’s contention the “closed-staff” arrangement is unlawful, there is really no contention made that hospital’s decision to continue operating its chronic hemodialysis unit on a “closed-staff” basis is contrary to established public policy. (Cf.
 
 Rosner
 
 v.
 
 Eden Township Hospital Dist.,
 
 58 Cal.2d 592, 598 [25 Cal.Rptr. 551, 375 P.2d 431] [rule as applied authorized expulsion for exposing negligent hospital practices];
 
 Bernstein
 
 v.
 
 Alameda etc. Med. Assn.,
 
 139 Cal.App.2d 241, 245-246 [293 P.2d 862] [rule as applied authorized expulsion for privileged statements in a judicial proceeding].) The contention that hospital’s decision to retain the “closed-staff” mode of operation is unlawful is devoid of merit.
 

 Although most of the reported cases deal primarily with “fair procedure” problems in relation to adjudicatory decisions, there can be no doubt that, because denial of staff membership may effectively impair a physician’s right fully to practice his profession, neither a private nor public hospital may unreasonably or arbitrarily exclude a physician otherwise qualified from membership on its staff (See, e.g.,
 
 Ezekial
 
 v.
 
 Winkley, supra,
 
 20 Cal.3d at p. 272;
 
 Anton
 
 v.
 
 San Antonio Community Hosp., supra,
 
 19 Cal.3d at p. 815;
 
 Pinsker
 
 v.
 
 Pacific Coast Society of Orthodontists, supra,
 
 12 Cal.3d at pp. 549-554;
 
 Pinsker
 
 v.
 
 Pacific Coast Soc. of Orthodontists, supra,
 
 1 Cal.3d at p. 166;
 
 Ascherman
 
 v.
 
 Saint Francis Memorial Hosp., supra,
 
 45 Cal.App.3d 507.) However, it does not necessarily follow that the governing authority of a hospital may not make a policy decision or adopt a rule of general application that certain facilities shall be operated by the hospital itself through an arrangement with one or more physicians to the exclusion of all members of the staff except those who may be coincidentally employed in such operation.
 
 (Blank
 
 v.
 
 Palo Alto-Stanford Hospital Center, supra,
 
 234 Cal.App.2d at p. 386.) Indeed, in every case brought to our attention in which a hospital’s operation of a facility on a “closed-staff” basis was challenged, the decision of the governing authority of the hospital has been upheld.
 
 (Blank
 
 v.
 
 Palo Alto-Stanford Hospital Center, supra,
 
 234 Cal.App.3d 377 [radiology department];
 
 Letsch
 
 v.
 
 Northern San Diego County Hosp. Dist.,
 
 246 Cal.App.2d 673 [55 Cal.Rptr. 118] [radiology department];
 
 Benell
 
 v.
 
 City of Virginia, supra,
 
 104 N.W.2d 633 [radiology department];
 
 Dattilo
 
 v.
 
 *392
 

 Tucson General Hospital
 
 (1975) 23 Ariz.App. 392 [533 P.2d 700] [nuclear medicine services];
 
 Adler
 
 v.
 
 Montefiore Hospital Ass’n of W. Pa.
 
 (1973) 453 Pa. 60 [311 A.2d 634] [cardiology laboratory].)
 

 In
 
 Willis
 
 v.
 
 Santa Ana etc. Hospital Assn.,
 
 58 Cal.2d 806, 810 [26 Cal.Rptr. 640, 376 P.2d 568], after deciding antitrust legislation was inapplicable to professional practice, the court held a cause of action was stated by a physician against a hospital association on allegations that notwithstanding his eminent qualifications, he was expelled from staff membership at one hospital and denied staff membership at several other hospitals as a result of a conspiracy of defendants to dominate and control the practice of osteopathic medicine and deprive him of his practice. In so holding, the court relied upon, the established common law principle that intentional interference with the right to pursue a lawful calling or profession by unlawful means or by means otherwise lawful without sufficient justification or privilege constitutes a civil wrong. (58 Cal.2d at p. 810.) Although Dr. Lewin neither pleaded nor proved comparable facts, we, as did the court in
 
 Blank,
 
 consider the possible application of these principles to the case at bench. As the court in
 
 Blank
 
 indicated, the issues are: (1) whether there was an interference with plaintiff’s right to practice his profession, (2) whether such interference was intentional, and, if so, (3) whether such interference was either (a) by unlawful means, or (b) by means otherwise lawful, but unprivileged or without sufficient justification. (234 Cal.App.2d at p. 384.)
 

 On this record, there is a real question whether there was any substantial interference with Dr. Lewin’s right to practice. He confines his practice to internal medicine and nephrology, but a substantial portion of his practice is consultive work with other physicians. He does treat patients who require hemodialysis on a chronic basis, but he has hemodialysis privileges at a substantial number of Orange County hospitals as well as at the proprietary facility established by him and of which he is the medical director and principal owner. He recounted only three specific instances in which hospital’s “closed-staff” operation of its chronic hemodialysis unit interfered with his practice. In one case, a patient of his was hospitalized at St. Joseph for psychiatric treatment and needed renal dialysis. To avoid changing physicians for these treatments, it was necessary to have the patient transported several times to another hospital where Dr. Lewin exercised hemodialysis privileges. The second instance involved a Catholic patient who would probably require renal dialysis and preferred the treatment be performed at St. Joseph. Dr. Lewin had not informed this patient he did not have hemodialysis
 
 *393
 
 privileges at St. Joseph, and she had not said she would go to no other facility. This patient left Dr. Lewin’s care before the problem matured. In the third instance a prospective patient of Dr. Lewin indicated he preferred receiving treatment at St. Joseph, and the last Dr. Lewin had heard this patient was being treated by a member of the nephrology group.
 

 At the hearing before the executive committee, Dr. Lewin stated with respect to his need for chronic hemodialysis privileges at St. Joseph: “The issue I am attacking here is a philosophical issue. In all frankness, I would never see this hospital as a primary dialysis base for myself. . . .” A bit later he said: “I’ll tell you very frankly my plan is not make major use of St. Joseph dialysis facility. It does involve an extra trip for me every time I do. The issue that I am fighting here is, to me, a moral issue. I don’t like to be a castrated nephrologist. I feel that that is in essence what the decision of this committee has made me.”
 

 Although a showing of strict economic necessity may no longer be required (see
 
 Ascherman
 
 v.
 
 Saint Francis Memorial Hosp., supra,
 
 45 Cal.App.3d at p. 511; cf.
 
 Pinsker
 
 v.
 
 Pacific Coast Soc. of Orthodontists, supra,
 
 1 Cal.3d at pp. 165-166), judicial intervention in staff exclusion cases, as opposed to expulsion cases, is generally limited to situations involving substantial economic ramifications.
 
 (Ezekial
 
 v.
 
 Winkley, supra,
 
 20 Cal.3d at pp. 272, 277.) Dr. Lewin’s need for and interest in chronic hemodialysis privileges at St. Joseph appear to be at least as much philosophical and personal as economic. However, we need not decide definitively whether the interference with Dr. Lewin’s right to practice was sufficiently substantial to satisfy the first element of the
 
 Willis-Blank
 
 formula. The relatively insubstantial nature of the interference has a direct bearing on the required showing of justification or privilege, and it is our conclusion that whatever interference there may have been it was fully justified or privileged. We turn then to the question whether the interference was by unlawful means or lawful means unprivileged and without sufficient justification.
 

 There was no interference by unlawful means. The only suggestion of unlawful means is found in the petition for writ of mandate in which it is alleged the “contract” between hospital and the nephrology group is “unlawful.” However, “an agreement which confers an exclusive privilege and by reason thereof excludes others is not per se illegal.”
 
 (Blank
 
 v.
 
 Palo Alto-Stanford Hospital Center, supra,
 
 234 Cal.App.2d at p. 385.)
 

 
 *394
 
 “Whether there is justification [or privilege] is determined not by applying precise standards but by balancing, in the light of all the circumstances, the respective importance to society and the parties of protecting the activities interfered with on the one hand and permitting the interference on the other.”
 
 (Willis
 
 v.
 
 Santa Ana etc. Hospital Assn., supra,
 
 58 Cal.2d at p. 810.) Among the factors to be considered are the nature of the actor’s conduct, the object sought to be accomplished and the interest sought to be advanced by the actor’s conduct, and the extent of the hardship caused to the person against whom the actor’s conduct is directed. (Rest., Torts, §§ 765, 766, 767;
 
 Blank
 
 v.
 
 Palo Alto-Stanford Hospital Center, supra,
 
 234 Cal.App.2d at p. 385.) Here, in the judgment of the executive committee of the medical staff and hospital’s board of trustees, the decision to continue operating its chronic hemodialysis unit on a “closed-staff” basis would enhance the quality of patient care and reduce its cost and would facilitate administration of the hospital. These are worthy objectives advancing important social interests. Except for whatever interference with the practice of medicine by some physicians has resulted, hospital’s conduct was exemplary. It afforded Dr. Lewin an opportunity to express his views and present the views of others. It proceeded in a deliberate fashion to consider the competing interests and relative merits of the two plans and only then made its policy decision. As we have seen, its decision was fully justified by the advice it received from the qualified persons who appeared at the hearing. Finally, as we have seen, the extent of the hardship caused Dr. Lewin, at least in economic terms, does not appear to be great. We conclude as did the courts in
 
 Blank
 
 and
 
 Letsch,
 
 on very similar facts, that the interference with Dr. Lewin’s right to practice his profession resulting from hospital’s decision to operate its chronic dialysis unit on a “closed-staff’ basis is justified and that hospital’s conduct is privileged under the circumstances shown.
 

 Damages
 

 In view of the foregoing conclusions Dr. Lewin is not entitled to recover damages, and we need not consider his contention the court’s ordering a reference on the issue of damages is not appealable nor hospital’s contention it was deprived of an opportunity to present evidence on the question of its liability for damages by the apparent agreement of the parties and the court that the claim for damages would be litigated at another time.
 

 
 *395
 

 Disposition
 

 The order granting petition for writ of mandate and ordering reference of issue of damages is reversed with directions to the trial court to recall and annul its peremptory writ of mandate and to enter judgment denying the petition for writ of mandate.
 

 Tamura, Acting P. J., and McDaniel, J., concurred.
 

 [1]
 

 "Hemodialysis (artificial kidney): The use of the artificial kidney, now available in many medical centers and large hospitals, may be lifesaving in poisoning due to dialyzable and nephrotoxic agents. In the former, hemodialysis hastens the removal of the poisons; in the latter, it serves as a temporary substitute for non-functioning kidneys.” (The Merck Manual (11th ed. 1966) p. 1230.)
 

 [2]
 

 The performance of chronic hemodialysis in hospitals is subject to detailed state administrative regulation. (See Cal. Admin. Code, tit. 22, § 70441 et seq.)
 

 [3]
 

 We place the word “private” in quotes because, as respects the exclusion or expulsion of physicians from staff membership and the procedures requisite thereto, there is little difference legally between public and private hospitals. (See, e.g.,
 
 Ezekial
 
 v.
 
 Winkley,
 
 20 Cal.3d 267, 274 [142 Cal.Rptr. 418, 572 P.2d 32];
 
 Pinsker
 
 v.
 
 Pacific Coast Society of Orthodontists,
 
 12 Cal.3d 541, 554, fn. 12 [116 Cal.Rptr. 245, 526 P.2d 253];
 
 Ascherman
 
 v.
 
 San Francisco Medical Society,
 
 39 Cal.App.3d 623, 646 [114 Cal.Rptr. 681];
 
 Blank
 
 v.
 
 Palo Alto-Stanford Hospital Center,
 
 234 Cal.App.2d 377, 383, fn. 2 [44 Cal.Rptr. 572].) In
 
 Ascherman,
 
 the court concluded: “[T]he power of a nonprofit hospital, whether public or private, to pass on an application for appointment to or renewal of staff membership is a fiduciary power to be exercised reasonably and for the public good. . . .” (39 Cal.App.3d at pp. 631, 643-644; accord:
 
 Pinsker
 
 v.
 
 Pacific Coast Soc. of Orthodontists,
 
 1 Cal.3d 160, 166 [81 Cal.Rptr. 623,460 P.2d 495].)
 

 [4]
 

 In his deposition, which was part of the evidence considered by the trial court, Dr. Lewin identified the following Orange County hospitals as having chronic hemodialysis facilities: Los Alamitos General Hospital, Mercy General Hospital, Mission Community Hospital, Orange County Medical Center, Palm Harbor General Hospital, Santa Ana-Tustin Community Hospital, South Coast Community Hospital, Tustin Community Hospital, and West Anaheim Community Hospital. Other portions of the record indicate a number of other hospitals in Orange County operate hemodialysis facilities including Fountain Valley, Pacifica, and St. Jude.
 

 [5]
 

 In his deposition Dr. Lewin identified two “free-standing” (unconnected with the hospital) hemodialysis facilities in Orange County: Artificial Kidney Foundation and Nephron, Inc., the latter of which he is the medical director.and principal owner.
 

 [6]
 

 The record indicates the members of the nephrology group are members of the staff at at least one other hospital but they perform no chronic dialysis services in any facility other than at St. Joseph and little or no acute dialysis services elsewhere. They do see patients at other hospitals on a consultation basis. Dr. Gentile estimated they see “[o]ne patient every two weeks” elsewhere than at St. Joseph. Members of the group are involved in an innovative effort to provide hemodialysis services in Brawley in Imperial County by training physicians in that area and establishing a satellite facility to the facility at St. Joseph by use of a computer. They have performed some dialysis services in connection with that project, but it does not interfere with their operation and performance of chronic hemodialysis services at St. Joseph.
 

 [7]
 

 Dr. Lewin’s interest in the hemodialysis facility at St. Joseph was manifested as early as 1972. In December of that year Dr. Lewin wrote to the hospital’s administrator requesting acute hemodialysis privileges. That request was denied, but Dr. Lewin did not
 
 *379
 
 press the matter. In 1973 or 1974, hospital determined to expand its hemodialysis facility and sought permission of the local voluntary health planning agency to do so. At a public hearing held by that agency, Dr. Lewin objected to a “closed-staff” policy. The medical directors of hospital’s hemodialysis facility testified, however, that the best interests and well-being of patients were served by such a policy due to superior physician-nurse communications and to the uniformity of patient care policies. Subsequently, the proposed plan of expansion was approved.
 

 [8]
 

 The nephrologist on the medical committee was not present, and the committee was not advised about and did not consider or discuss problems relating to cohesiveness or administration of the hemodialysis facility nor the teaching of personnel.
 

 [9]
 

 A tape recording of the hearing was made and subsequently transcribed. It is 30 single-spaced, typewritten pages in length.
 

 [10]
 

 This form of finding violates subdivision (e) of rule 232 of the California Rules of Court which reads in pertinent part: “Findings shall not refer merely to the truth or falsity of allegations contained in the pleadings.” This irregularity was compounded by the court’s denying hospital’s request for findings on the ground its findings were
 
 *382
 
 contained in its order, thereby depriving hospital of any meaningful opportunity to object to the sufficiency of the findings or propose other findings as contemplated by the procedure provided in rule 232.
 

 [11]
 

 The language of the order is most curious in view of the fact that no “other qualified physicians” are using the facilities of the chronic hemodialysis unit except the members of the nephrology group who also perform all of the tasks of administration of the unit, which Dr. Lewin indicated he could not undertake.
 

 [12]
 

 Even if these principles were otherwise applicable, it is most doubtful whether Dr. Lewin’s asserted right to chronic hemodialysis privileges at St. Joseph could be characterized as vested. Such privileges have never been granted him. With respect to such privileges, he is a mere applicant. (See
 
 Bixby
 
 v.
 
 Pierno, supra, 4
 
 Cal.3d at p. 146; cf.
 
 Anton
 
 v.
 
 San Antonio Community Hosp., supra,
 
 19 Cal.3d at pp. 823-824.)
 

 [13]
 

 In an administrative mandate proceeding, the trial court reviews the administrative record, receiving additional evidence only if it was unavailable at the time of the administrative hearing or was improperly excluded from the administrative record. (See
 
 No Oil, Inc.
 
 v.
 
 City of Los Angeles,
 
 13 Cal.3d 68, 79, fn. 6 [118 Cal.Rptr. 34, 529 P.2d 66]; Cal. Administrative Mandamus (Cont.Ed.Bar 1966) §§ 13.4-13.7, pp. 218-221.) By contrast, in a traditional mandate proceeding, if there exists contested issues of fact, trial is had as in civil actions generally and evidence may be received in addition to the administrative record. (See
 
 No Oil, Inc.
 
 v.
 
 City of Los Angeles,
 
 supra; Cal. Civil Writs (Cont.Ed.Bar 1970) § 17.9, p. 408.) However, the determination whether the decision was arbitrary, capricious or entirely lacking in evidentiary support must be based on the “evidence” considered by the administrative agency.
 
 (Brock
 
 v.
 
 Superior Court, supra,
 
 109 Cal.App.2d at pp. 607, 608.)
 

 [14]
 

 This factor is especially significant in chronic hemodialysis because frequently patients exhaust their private medical insurance coverage and must thereafter depend on government programs under which the allowable price for treatment is quite modest.
 

 [15]
 

 Recognizing the excellence of administration under the present arrangement, Dr. Lewin made the following suggestion: “You have four good men here. You give them a contract to administer the unit. They have administrative responsibility when they train a person and they are paid to do this. That provides a continuity, provides a continuing philosophy. . . .”