Filed 9/29/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
DIVISION FOUR

| | |
|---|---|
| ARASH ALBORZI et al., | B299067 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 18STCV09716) |
| v. | |
| UNIVERSITY OF SOUTHERN CALIFORNIA et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Yolanda Orozco, Judge. Reversed and remanded with instructions.

Fenton Law Group, Henry R. Fenton, Dennis E. Lee and Summer Main for Plaintiffs and Appellants Arash Alborzi, M.D. and Arash Alborzi, M.D., Inc.

Nelson Hardiman, Mark S. Hardiman, John A. Mills, Salvatore J. Zimmitti and Jonathan W. Radke for Defendants and Respondents University of Southern California, Keck School of Medicine of USC and USC Verdugo Hills Hospital.

Hooper, Lundy & Bookman, Devin M. Senelick, Annalee M. Clubb and Bridget A. Gordon for Defendants and Respondents Concord Hospitalist Group and Elevate Health Group.

# INTRODUCTION

Plaintiffs Arash Alborzi, M.D., and Arash Alborzi, M.D., Inc. sued defendants University of Southern California, Keck School of Medicine of USC, and USC Verdugo Hills Hospital (collectively, USC); as well as Concord Hospitalist Group and Elevate Health Group. Alborzi and his corporation were part of a panel of on-call physicians at Verdugo Hills Hospital. Plaintiffs alleged that defendants entered into an illegal referral and kickback scheme in which USC paid below-market rates for hospitalist services from Concord, and Concord self-referred patients to Elevate, which shared ownership with Concord. Plaintiffs alleged that when Alborzi complained to management at Verdugo Hills Hospital about the illegal scheme, the hospital stopped referring patients to him and eventually dissolved the on-call panel in retaliation. Plaintiffs' causes of action include violations of Health and Safety Code section 1278.5, a health care whistleblower statute; Government Code section 12653, part of the California False Claims Act; and Business and Professions Code section 17200, et seq., the Unfair Competition Law.

USC demurred to plaintiffs' complaint, asserting that plaintiffs were required to exhaust all judicial remedies by filing a petition for writ of mandamus under Code of Civil Procedure section 1085 prior to filing an action for damages. The trial court sustained the demurrer on that basis and entered judgment for all defendants. We find that the trial court erred, because plaintiffs were not required to exhaust judicial remedies before asserting the causes of action they have alleged here.

USC asserted in the alternative that plaintiffs' complaint failed to allege facts sufficient to state a cause of action. On appeal, plaintiffs argue that three of their six causes of action

were sufficiently alleged.  We find plaintiffs' complaint alleged sufficient facts to support causes of action for violations of Health and Safety Code section 1278.5 and Business and Professions Code section 17200, et seq., and therefore the demurrer should have been overruled as to those claims.  We find that plaintiffs' cause of action for violation of Government Code section 12653 failed to allege sufficient facts to state a cause of action, but leave to amend was warranted.  Finally, we find that plaintiffs have abandoned the three causes of action they did not address on appeal.  We therefore reverse the judgment, and remand the action with directions to enter a new order sustaining the demurrer in part and overruling the demurrer in part.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.    Plaintiffs' allegations**

Plaintiffs filed their initial complaint on December 26, 2018.  USC filed a demurrer and motion to strike.  Before the scheduled hearing, plaintiffs filed a first amended complaint (FAC) alleging the same six causes of action.  The FAC is the operative complaint for purposes of appeal, and we focus on the allegations in that version.

Plaintiffs alleged that Alborzi is a physician specializing in infectious disease, and he owns Arash Alborzi, M.D., Inc., which "is comprised of other duly licensed physicians who also specialize in infectious disease."  Alborzi and all members of Arash Alborzi, M.D., Inc. "have medical staff privileges at Verdugo Hills Hospital [(VHH)], which is owned by the University of Southern California."  Plaintiffs were on the infectious disease (I.D.) on-call panel at VHH.  "When patients came to VHH and required immediate emergency infectious disease treatment, were admitted at VHH and required acute

3

stabilizing infectious disease treatment, or any time a patient required an infectious disease specialist to stabilize their condition, the respective patient would be assigned to an infectious disease specialist from the I.D. call panel." The physicians on the I.D. call panel were on a rotating schedule, typically created months in advance, which "indicated which weeks the respective specialist had to be available, at any hour of the day, to see assigned patients." The same on-call panel system existed for other specialties, such as nephrology and anesthesia. Plaintiffs alleged that "[s]tructured call panels are common within hospitals and are required for all hospitals who receive payment for patient services from government sources" pursuant to state and federal law, including VHH. Plaintiffs alleged that on-call panels "assist in preventing patient-endangering self-referrals, bribes, and kickbacks because patients are assigned to physicians based solely on the call panel schedule."

Plaintiffs alleged on information and belief that in July 2017, "Defendant[ ] Concord entered into an exclusive contract with Defendant VHH to provide hospitalist services to every patient who presented to VHH without an assigned primary care provider." They alleged that the contract was "below market value for comparable hospitalist services." Plaintiffs alleged that Concord was owned by three physicians: Dr. Narbeh Tovmassian, Dr. Garen Derhartunian, and Dr. Devinder Ghandi. Tovmassian and Derhartunian also owned defendant Elevate, which "provides medical services including, but not limited to, primary care and nursing home services." Plaintiffs alleged that Concord referred VHH patients to Elevate, and that "Defendant Concord benefits financially from self-referring Defendant VHH patients to Defendant Elevate because the same physicians own Defendant

4

entities Concord and Elevate." Plaintiffs alleged that this constituted an improper kickback arrangement in violation of the federal anti-kickback statute (42 U.S.C. § 1320a-7b(b)), and it was a self-referral arrangement that violated state and federal law. (42 U.S.C. § 1395nn(a)(1), Bus. & Prof. Code, §§ 650.01, 650.02, Health & Saf. Code, § 445, et seq.)

According to plaintiffs, beginning in August 2017 the number of patients assigned to them via the I.D. call panel "slowed significantly," and "an unusual number of patient consultations began to be referred to two specific infectious disease specialists, Dr. Hun and Dr. Maslow." Plaintiffs alleged on information and belief that "Dr. Maslow entered into a financial arrangement with Dr. Hun wherein Dr. Maslow receives a percentage of Dr. Hun's reimbursements for medical services. This is a kickback arrangement in violation of the Anti-Kickback Statute." Plaintiffs also alleged that Dr. Hun was "employed either directly or as a contractor" by Elevate, and "Defendant Concord benefits financially from self-referring Defendant VHH patients to Dr. Hun for infectious disease consultations" because Elevate employed Hun.

Plaintiffs alleged that beginning in December 2017, Alborzi became concerned about the "increasingly slowing patient assignments" from the I.D. call panel, since "December is the beginning of flu season, and yet patient assignments from the I.D. call panel were suspiciously low. This is when Dr. Alborzi first became aware" of the defendants' financial arrangements. Between December 2017 and June 2018, Alborzi "expressed concerns . . . regarding patient safety, the presence of illegally incentivized decisions about patient care by and among defendants, and the inability to practice medicine" resulting from

5

defendants' "financial arrangements" and "the non-use, or misuse, of the on-call panel system." Alborzi reported his concerns to Keith Hobbs, Chief Executive Officer of VHH, in February and April 2018. He also reported his concerns to Dr. Armand Dorian, Chief Medical Officer of VHH, in May 2018. In July 2018, plaintiffs received notice that the I.D. call panel had been terminated entirely. Plaintiffs alleged that termination of the on-call panel "was a retaliatory act" by defendants because Alborzi had reported his concerns about the "illegal financial arrangements" among defendants.

Plaintiffs alleged six causes of action in the FAC. In their first cause of action against USC, plaintiffs alleged violations of Health and Safety Code section 1278.5 (section 1278.5), which bars retaliation against whistleblowers in healthcare professions. Plaintiffs alleged USC stopped providing plaintiffs with panel consultations and eventually terminated the I.D. call panel in retaliation against Alborzi for reporting his concerns about the financial arrangements among defendants. Plaintiffs asserted that Alborzi's reports concerned patient safety and constituted protected activity under section 1278.5. They alleged that defendants dissolved the I.D. call panel "in an attempt to injure Plaintiff[s] financially," and requested punitive damages.

In their second cause of action against USC, plaintiffs alleged violations of Government Code section 12653, part of the California False Claims Act (CFCA, §§ 12650, et seq.), which provides whistleblower protections for employees. Plaintiffs contended they "were, and continue to be, discriminated against . . . by receiving diminished patient referrals," and they were "singled out because they were not involved in the illegal financial arrangements described, but infectious disease

6

specialists who were, such as Dr. Hun, received increased patient referrals." Plaintiffs further alleged that USC's "discriminatory conduct towards Plaintiffs was, in part, a retaliatory action against Dr. Alborzi for his efforts to stop violations under the California False Claims Act."

In their third cause of action for wrongful discipline against USC, plaintiffs alleged that "[a]s a member of the medical staff at VHH, Dr. Alborzi had an implied in fact contract with Defendant VHH not to impose disciplinary measures except for good causes [*sic*]." VHH "violated that contract" when it "stopped providing Dr. Alborzi with patient consultations and dissolved the infectious disease on-call panel as a discipline for reporting illegal activities."

In plaintiffs' fourth cause of action for intentional interference with prospective economic advantage, plaintiffs alleged that all defendants "intentionally interfered with Plaintiffs['] ability to practice medicine and Plaintiffs' ability to provide services to patients at Verdugo Hills Hospital by entering into illegal financial arrangements and dissolving the infectious disease specialist on-call panel."

Plaintiffs' fifth cause of action was for unfair business practices under the unfair competition law (UCL), Business and Professions Code section 17200, et seq., against all defendants. Plaintiffs alleged that defendants violated Business and Professions Code section 650, et seq.; Health and Safety Code section 445; Welfare and Institutions Code section 14107.2; and Business and Professions Code section 2273, subdivision (a), "by participating in financial arrangements" including "inducing illegal remuneration, bribes, fee-splitting, kickbacks, and self-

7

referrals." Plaintiffs asserted that these actions constituted "unlawful, unfair, and fraudulent business practices."

In their sixth cause of action for negligence against all defendants, plaintiffs alleged that a hospital and its medical staff have a duty to "provide patients safe and competent clinical care." A hospital and medical staff rely on each other to accomplish this purpose, therefore "Defendants owed a duty of care to Plaintiffs because Plaintiffs are physicians on the medical staff at VHH." Defendants breached that duty by participating in the "untoward financial arrangements," interfering with Alborzi's "right to practice medicine."

Plaintiffs sought compensatory damages, including mental and emotional distress; double back pay plus interest; punitive damages; civil penalties; injunctive relief; costs; and attorney fees.

## B. USC's demurrer

USC filed a demurrer to the FAC, asserting that each claim failed to allege facts sufficient to state a cause of action, and each was unintelligible. (Code Civ. Proc., § 430.10, subds. (e), (f).)[1] USC asserted that plaintiffs "were required to petition for and obtain a writ of mandamus under Code of Civil Procedure section 1085 to challenge [VHH's] decision to contract exclusively for Hospitalist services." It argued that it had a "settled right,

---

[1] Concord and Elevate also jointly demurred to the FAC, asserting that plaintiffs' fourth, fifth, and sixth claims failed to allege facts sufficient to state a cause of action and were unintelligible. (Code Civ. Proc., § 430.10, subds. (e), (f).) Their demurrer was scheduled to be heard later than USC's, and because the court sustained USC's demurrer and dismissed the case, Concord and Elevate's demurrer was never heard.

8

confirmed over decades of unbroken California case law, to contract exclusively with a physician group to staff a particular hospital service." USC asserted that VHH's "decision to contract with Concord and to dissolve the on-call panel were quasi-legislative rules because their application was not limited to Dr. Alborzi or his group's physicians." Because this decision "would be applicable to any physician who practiced at VHH," it was a quasi-legislative decision, as opposed to a quasi-judicial action impacting a particular doctor. USC argued that quasi-legislative actions must be challenged by a writ of mandate, and could not be challenged in an action for damages.

USC relied on cases such as *Lewin v. St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368 (*Lewin*), which we discuss in more detail below. Briefly, in *Lewin* a physician challenged the manner in which a nonprofit hospital staffed its chronic renal hemodialysis facility. The hospital argued that its staffing decision was "quasi-legislative" in nature, and therefore it could only be challenged in a proceeding for traditional mandate under Code of Civil Procedure section 1085. The Court of Appeal agreed, holding that "the limited judicial review applicable to the quasi-legislative actions of a governmental administrative agency is also appropriately applied to judicial review of rule-making or policy-making actions of a nonprofit hospital corporation." (*Id.* at p. 384.) The court reasoned that "[t]he operation and administration of a hospital involves a great deal of technical and specialized knowledge and experience" (*ibid.*), so courts "must guard against unduly interfering with the board's autonomy by substituting judicial judgment for that of the board." (*Id.* at p. 385.) USC asserted that under *Lewin* and other cases, "Plaintiffs' claims for damages do not provide an alternative route to

9

invalidate [VHH's] contracting decisions. The law is clear that a plaintiff alleging torts arising from improper agency action must first have such action declared invalid *in a mandamus action* before it can seek or recover from any torts."

USC also argued that the individual causes of action in the FAC failed. For the first cause of action, USC argued that because it did not have a duty to maintain an infectious disease on-call panel, the decision to end the on-call panel could not support a cause of action under section 1278.5. In addition, because the decision affected every doctor on the on-call panel, it could not be deemed retaliatory against plaintiffs. As for the second cause of action under the CFCA, defendants asserted that plaintiffs did not allege facts suggesting that USC submitted any false or fraudulent claims. USC argued that the third cause of action for wrongful discipline failed because such a claim was applicable only to employers and employees, and plaintiffs were not employees of USC. Regarding the fourth cause of action for intentional interference with prospective economic advantage, USC argued that plaintiffs failed to allege an existing relationship with a third party or any interference in that relationship. USC asserted that the facts alleged in plaintiffs' fifth cause of action for unfair competition were "insufficient to notify [VHH] which prong of the UCL it is charged to have violated." Finally, USC contended that plaintiffs' sixth cause of action for negligence failed because USC did not owe a duty of care to plaintiffs.

C.   **Opposition and reply**

In their opposition, plaintiffs argued that section 1278.5 did not require a claimant to exhaust administrative remedies, so it was irrelevant whether VHH's exclusive contract for services was

quasi-legislative.  Plaintiffs also asserted that the relevant issue "is not whether the decision to dissolve the on-call panel was quasi-judicial or quasi-legislative, it is whether the decision to dissolve the on-call panel was retaliatory and aimed at Dr. Alborzi."  They further asserted that "whether the decision resulted in collateral damage to other physicians is inconsequential."  Plaintiffs also argued that the facts alleged in the FAC were sufficient to support each cause of action. Plaintiffs requested leave to amend the FAC if the court were to sustain the demurrer.

In reply, USC argued that plaintiffs ignored the settled law of *Lewin* and similar cases, and although plaintiffs characterized their claims as involving "patient safety," they were actually only personal claims.  USC asserted that "[s]ection 1278.5 is concerned with—and only applies to prohibit—retaliatory action," and "[q]uasi-legislative [action] is by definition not retaliatory." USC also argued that plaintiffs "give little to no effort [to address] any of the arguments raised in the Demurrer with respect to the second through sixth causes of action."  USC further argued that leave to amend should be denied, because plaintiffs had already attempted and failed to remedy the defects in their pleadings.

**D.    Court ruling**

The court issued a tentative ruling sustaining the demurrer because plaintiffs failed to bring a mandamus action.  At the hearing, plaintiffs' counsel asserted that although USC argued its decision to dissolve the I.D. call panel was quasi-legislative action that affected all doctors, "[i]n our first amended complaint, we don't allege that.  We state that it's being allied [*sic*] to Dr. Alborzi and not to those who are involved in the fraudulent

kickback scheme. That's an issue of fact, not an issue of law and shouldn't be subject to a demurrer." Plaintiffs' counsel added, "Whether this is or isn't a legislative act is an issue of fact," and noted that plaintiffs "don't know how [the] decision came about and whether it was legislative or not." The court noted that a mandamus action would allow plaintiffs to do discovery on that issue. After discussing the relevant case law with the parties' counsel, the court stated that it would sustain the demurrer.

In the tentative ruling the court adopted as its final order, the court recounted the parties' arguments and stated, "The Court finds Defendants' arguments persuasive and finds that Plaintiffs have failed to and cannot allege that they have successfully challenged Defendants' decision under the mandamus procedure. The cases cited by Plaintiffs are all distinguishable in that they hold that quasi-judicial decisions need not be successfully challenged prior to bringing a suit for retaliation. As noted by Defendants, however, a quasi-legislative decision is not targeted at a particular individual, but rather is a rule made applicable to all relevant parties and to all future situations. Thus, the reasoning in the cases cited by Plaintiff[s] is inapplicable here." The court sustained USC's demurrer without leave to amend and dismissed the case with prejudice as to all defendants.

The court entered judgment in favor of all defendants on June 24, 2019. Plaintiffs timely appealed.

## DISCUSSION

Plaintiffs contend on appeal that the trial court erred by holding that VHH's decision to disband the I.D. call panel was quasi-legislative based on the facts alleged in the FAC, and by holding that plaintiffs were barred from bringing this action due

12

to their failure to file a petition for writ of mandamus under Code of Civil Procedure section 1085.  As discussed below, we agree on both issues, and reverse the trial court's ruling. We then address the parties' contentions as to whether plaintiffs alleged sufficient facts to support their causes of action.

On appeal after a demurrer has been sustained, we determine de novo whether the complaint states facts sufficient to constitute a cause of action.  (*Loeffler v. Target Corp*. (2014) 58 Cal.4th 1081, 1100.)  We "'assume the truth of the complaint's properly pleaded or implied factual allegations.'"  (*Ibid*.)  "It is plaintiffs' burden to show either that the demurrer was sustained erroneously or that the trial court's denial of leave to amend was an abuse of discretion."  (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655.)

## A. Quasi-legislative action

The trial court impliedly found that USC's actions were quasi-legislative, and that as a result, plaintiffs were required to exhaust judicial remedies by bringing a petition for writ of mandamus rather than filing a civil action. The court embraced USC's reasoning that staffing decisions affecting an entire department—such as dissolving the I.D. call panel—are quasi-legislative. However, USC's attempts to cast VHH's decision as a run-of-the-mill staffing decision contradict the facts alleged in the FAC. Plaintiffs alleged that VHH's action was targeted at plaintiffs and was retaliatory, and we "take the allegations of the operative complaint as true." (*Aryeh v. Canon Business Solutions, Inc*. (2013) 55 Cal.4th 1185, 1191.)  Because USC's arguments rely on factual conclusions unsupported by the record, the demurrer should have been overruled.

13

1.     *Hospital staffing policies can be quasi-legislative*

"[T]he terms 'quasi-legislative' and 'quasi-judicial' are used to denote . . . differing types of action. Quasi-legislative acts involve the adoption of rules of general application on the basis of broad public policy, while quasi-judicial acts involve the determination and application of facts peculiar to an individual case." (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1188.) "'Generally speaking, a legislative action is the formulation of a rule to be applied to all future cases, while an adjudicatory act involves the actual application of such a rule to a specific set of existing facts.'" (*Major v. Memorial Hospitals Assn.* (1999) 71 Cal.App.4th 1380, 1398 (*Major*).)

In a hospital setting, if a physician's *individual* medical staff privileges have been denied, suspended, or terminated because the physician failed to comply with established standards, "that administrative decision is classified as 'quasi-judicial' and review is by administrative mandamus." (*Hay v. Scripps Memorial Hospital* (1986) 183 Cal.App.3d 753, 758 (*Hay*).) "However, where the physician has had privileges denied or curtailed because of the implementation of a 'policy' of the hospital, the administrative action is classified as 'quasi-legislative' and reviewable by traditional mandamus." (*Ibid.*) When quasi-legislative acts are reviewed by traditional or ordinary mandamus under Code of Civil Procedure section 1085, "'the inquiry is limited to whether the decision was arbitrary, capricious, or entirely lacking in evidentiary support.'" (*McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1785.)

14

In *Lewin, supra*, the Court of Appeal found that "the limited judicial review" applicable to traditional mandamus is appropriate for the "judicial review of rule-making or policy-making actions of a nonprofit hospital corporation." (82 Cal.App.3d at p. 384.) The court explained, "The operation and administration of a hospital involves a great deal of technical and specialized knowledge and experience, and the governing board of a hospital must be presumed to have at least as great an expertise in matters relating to operation and administration of the hospital as any governmental administrative agency with respect to matters committed to its authority." (*Ibid*.) Thus, "[a] managerial decision concerning operation of the hospital made rationally and in good faith by the board to which operation of the hospital is committed by law should not be countermanded by the courts unless it clearly appears it is unlawful or will seriously injure a significant public interest." (*Id*. at p. 385.)

2. *Plaintiffs did not allege quasi-legislative action*

USC asserts that dissolution of the on-call panel at VHH was a quasi-legislative policy decision that could be challenged only by ordinary mandamus under Code of Civil Procedure section 1085, thus barring all of plaintiffs' causes of action. Plaintiffs disagree, asserting that they alleged USC's "policy decision" to dissolve the on-call panel was merely pretext, not a legitimate quasi-legislative decision, and the trial court erred by disregarding those allegations in the FAC. We agree with plaintiffs.

Plaintiffs alleged that defendants entered into an illegal kickback scheme, Alborzi complained about it, and USC dissolved the on-call panel in retaliation, thus blocking plaintiffs from receiving further referrals. USC cites to "settled law" that

15

hospital decisions affecting staffing—compared to quasi-judicial decisions that affect individuals—are quasi-legislative. It argues that "courts have uniformly determined that hospital operational decisions of general application are quasi-legislative as a matter of law." USC cites five cases in support, none of which supports such a finding under circumstances similar to those in this case. To the contrary, the cases USC cites involve trials or other proceedings in which courts considered evidence before determining that the hospitals' staffing decisions were quasi-legislative.

USC relies on *Lewin, supra*, 82 Cal.App.3d 368. In that case, the respondent hospital, St. Joseph Hospital of Orange, operated renal hemodialysis facilities on a "closed staff" basis, meaning that the facilities were used by a single group of nephrologists associated with the hospital. (*Id*. at pp. 375-376) Dr. Lewin, a local physician, requested privileges to use the hemodialysis units. The hospital approved his request regarding the acute hemodialysis unit, but denied it as to the chronic hemodialysis unit. Dr. Lewin filed a petition for writ of mandate, alleging that the hospital had a duty to allow him to use the unit and the hospital's exclusive contract with the limited group of physicians interfered with Dr. Lewin's ability to practice his profession. (*Id*. at pp. 380-381.)

The issue proceeded to a trial. Evidence discussed in the Court of Appeal's opinion includes the history of the hemodialysis unit (*Lewin, supra*, 82 Cal.App.3d at p. 376); information about the operation of the unit, including its billing practices, staffing, and daily operations (*id*. at pp. 377-378); the number of chronic patients treated in the unit (*id*. at p. 378); information about Dr. Lewin's education, medical practice, and privileges at various

16

hospitals (*ibid.*); detailed descriptions about Dr. Lewin's communications with St. Joseph Hospital's executive committee about his request to use the hemodialysis unit (*id.* at pp. 378-380); the recommendation by the hospital's medical committee, which was reviewed and approved by the executive committee, whose recommendation was then approved by the board of trustees (*id.* at p. 379); and records of two separate hearings on the issue in which relevant parties debated whether the units should continue to be operated on a "closed staff" basis (*id.* at pp. 379-380.)

The Court of Appeal in *Lewin* considered this evidence in finding that "The hearing held by the Executive Committee on October 16, 1975 and the resulting decision of the Executive Committee and the Board of Trustees to continue operating the chronic hemodialysis unit on a 'closed-staff' basis were clearly 'quasi-legislative' in nature." (*Lewin, supra,* 82 Cal.App.3d at p. 383.) The court gave several reasons for this finding, including that "[t]he operation and administration of a hospital involves a great deal of technical and specialized knowledge and experience" (*id.* at p. 384), so courts "must guard against unduly interfering with the board's autonomy by substituting judicial judgment for that of the board." (*Id.* at p. 385.)

USC also relies on *Mateo-Woodburn v. Fresno Community Hospital & Medical Center* (1990) 221 Cal.App.3d 1169 (*Mateo-Woodburn*), in which several anesthesiologists challenged a decision by the Fresno Community Hospital (FCH) board of trustees "to alter the system of delivery of anesthesia services at the hospital from a rotating 'open staff' to a 'closed' system." (*Id.* at pp. 1174-1175.) Following a trial, the superior court denied the physicians' request for a permanent injunction, dissolved a

17

preliminary injunction, denied the physicians' request for a writ of mandate, and decided the cause of action for declaratory relief in favor of the defendants. (*Id*. at p. 1174 & fn. 2.)

In the opinion affirming the judgment, the Court of Appeal discussed the bylaws governing the medical staff at FCH, including the formulation and approval of the bylaws (*Mateo-Woodburn, supra*, 221 Cal.App.3d at p. 1175); the manner in which the executive committee coordinated the medical staff departments (*id*. at p. 1176); how the anesthesiologists were scheduled for surgeries, including problems with the scheduling (*id*. at pp. 1176-1178); and the medical staff's request to change anesthesiology from an open to a closed staffing system (*id*. at p. 1187). The court further discussed the hospital board's procedure in considering and approving the change, including implementation of a task force to study the proposal (*id*. at p. 1178); board meetings and administrative hearings considering the changes, including transcripts from those meetings and hearings (*id*. at pp. 1178-1180); and communication regarding the hospital's contract with a new entity to manage the department of anesthesia and the terms of the contract itself (*id*. at pp. 1180-1181). The court found that based on the evidence, "the policy decision by FCH to go from an open to a closed system of delivery of anesthesia services was not irrational, arbitrary, contrary to public policy or procedurally unfair." (*Id*. at p. 1184.)

USC also cites *Hay, supra,* 183 Cal.App.4th 753, in which "Dr. Hay requested clinical privileges to perform dilation and curettage (D & C) procedures" at a local hospital, and his request was denied due to a "policy that a physician must satisfy a minimum requirement of completion of a residency in obstetrics and gynecology (OB-GYN) in order to receive D & C privileges" at

18

the hospital. (*Id.* at pp. 755-756.)  Hay petitioned for a writ of mandamus, which was denied.  The Court of Appeal's opinion affirming the judgment does not make clear whether the superior court held a full trial.  Nevertheless, the Court of Appeal discussed Dr. Hay's background and qualifications (*id.* at p. 756); his privileges at other hospitals (*ibid.*); the procedure followed after Dr. Hay requested privileges at the hospital, including the recommendations of the family practice supervisory committee and the OB-GYN supervisory committee (*id.* at p. 757); the votes of the executive medical committee and surgery supervisory committee (*ibid.*); Dr. Hay's appeal to a judicial review hearing committee and its report (*id.* at pp. 757-758); and Dr. Hay's appeal to the hospital's board of trustees (*id.* at p. 758.).

Citing *Lewin*, the court in *Hay* stated, "[W]here the physician has had privileges denied or curtailed because of the implementation of a 'policy' of the hospital, the administrative action is classified as 'quasi-legislative' and reviewable by traditional mandamus." (*Hay, supra*, 183 Cal.App.3d at p. 758.) The court discussed the reasoning behind the hospital's requirement for specific qualifications, and found that it was "not irrational for a hospital to require [certain] training as a minimum qualification for all obstetrical-gynecological surgeries." (*Id.* at p. 761.)  The court concluded that the hospital's policy "does not violate public policy and is not substantively irrational or unlawful." (*Id.* at p. 762.)

USC also relies on *Major, supra,* 71 Cal.App.4th 1380, which followed what the Court of Appeal characterized as a "lengthy court trial."  In that case, the defendant hospital group changed its anesthesiology departments from an open staff system to a closed system with an exclusive provider.  The new

19

provider did not offer subcontracts to several physicians who formerly practiced as part of the hospital's open staff, and the physicians sued "based on multiple theories, including alleged violations of the Unruh Civil Rights Act (Civ. Code, § 51), breach of contract, civil conspiracy, and tortious interference with plaintiffs' professional business relationships." (*Id*. at p. 1384.) The trial court found in favor of the defendants, and the plaintiff physicians appealed.

In an extensive fact section, the Court of Appeal discussed the hospital's medical staff bylaws (*Major, supra*, 71 Cal.App.4th at pp. 1386-1387); staffing and staffing problems within the anesthesiology department (*id*. at pp 1387-1392); investigation of the department's issues by a medical executive committee and development of a subcommittee to consider potential solutions (*id*. at pp. 1392-1395); adoption of the contract with the exclusive anesthesiology provider (*id*. at pp. 1395-1396); and communication to the plaintiff physicians that they had not been selected as subcontractors (*id*. at p. 1397). After discussing the evidence and applicable legal authority, the court stated, "We conclude that Memorial Hospitals' decision to close the anesthesiology department was quasi-legislative, since it was not directed at any specific physician or group of physicians. Rather, it was based on a genuine concern about the overall function of the anesthesiology department and directed at improving the quality of patient care provided by that department." (*Id*. at pp. 1410-1411.)

Finally, USC cites *Abrams v. St. John's Hospital & Health Center* (1994) 25 Cal.App.4th 628 (*Abrams*), which considered "the enforceability of an agreement between a hospital and a member of its medical staff where the member has contracted

20

away due process hearing rights otherwise afforded him or her by existing hospital and medical staff bylaws." (*Id.* at p. 631.) The plaintiff filed a complaint alleging causes of action for breach of contract, slander, negligent misrepresentation, and other causes of action, and in connection with the breach of contract causes of action, requested preliminary and permanent injunctions. (*Id.* at p. 635.) The trial court denied the plaintiff's request for a preliminary injunction, and the Court of Appeal affirmed. The court relied on *Mateo-Woodburn* in holding that the plaintiff was not entitled to a hearing before his contractual rights and staff rights could be terminated. (*Id.* at p. 638.)

Although USC is correct that these cases hold that a hospital's well-reasoned decision to change staffing in an entire department may be deemed quasi-legislative, none of these cases decided such issues at the pleadings stage or without consideration of the manner in which the hospital reached its decision. To the contrary, each case considered extensive evidence demonstrating the hospitals' staffing issues, the procedures employed in changing the staffing plan or implementing physician requirements, and the hospitals' reasons for establishing the standards or scheduling it did. As noted above, the court in *Lewin* stated that it was reasonable to treat hospital boards' staffing decisions as quasi-legislative because of the technical and specialized knowledge and experience required for operating a hospital. (*Lewin, supra*, 82 Cal.App.3d at p. 384.) Here, by contrast, there is no indication that VHH's staffing decisions were even made by a board, or that the decision involved legitimate considerations about the operation or administration of VHH. In fact, plaintiffs have alleged that the decision *did not* involve legitimate concerns about the need for

21

infectious disease specialists, that it undermined patient care, and it was done to cover up an illegal kickback scheme.  The trial court erred in ignoring plaintiffs' factual allegations in deciding the demurrer.

## B.    Plaintiffs' claims were not barred by their failure to exhaust judicial remedies.

USC also argues that there is a "longstanding rule requiring exhaustion of judicial remedies" regarding hospitals' quasi-legislative actions.  The trial court agreed, holding that plaintiffs "cannot allege that they have successfully challenged Defendants' decision under the mandamus procedure."  Even assuming for the sake of argument that the defendants' actions could be deemed quasi-legislative, this position is not supported by the authorities USC cites.  The doctrine of exhaustion of judicial remedies does not apply under the facts alleged in the FAC, nor were plaintiffs required to exhaust judicial remedies on their whistleblower causes of action.

"Under the doctrine of exhaustion of judicial remedies, '[o]nce a[n administrative] decision has been issued, provided that decision is of a sufficiently judicial character to support collateral estoppel, respect for the administrative decisionmaking process requires that the prospective plaintiff continue that process to completion, including exhausting any available judicial avenues for reversal of adverse findings.  [Citation.]  Failure to do so will result in any quasi-judicial administrative findings achieving binding, preclusive effect and may bar further relief on the same claims."  (*Runyon v. Board of Trustees of California State University* (2010) 48 Cal.4th 760, 773 (*Runyon*).)  Thus, the doctrine of exhaustion of judicial remedies applies where "there has been an adjudicatory, quasi-judicial decision in accordance

22

with established public or private procedures," and "the prior administrative proceedings possessed the requisite 'judicial character' such that they yielded decisions or findings that could later be given preclusive effect." (*Y.K.A. Industries, Inc. v. Redevelopment Agency of City of San Jose* (2009) 174 Cal.App.4th 339, 361 (*Y.K.A. Industries*).) The doctrine is "a form of res judicata, of giving collateral estoppel effect to the administrative agency's decision, because that decision has achieved finality due to the aggrieved party's failure to pursue the exclusive *judicial* remedy for reviewing administrative action." (*Briggs v. City of Rolling Hills Estates* (1995) 40 Cal.App.4th 637, 646 [emphasis in original].)

The doctrine of exhaustion of judicial remedies does not apply under the circumstances alleged by plaintiffs. First, "an employee seeking relief under . . . Government Code section 12653 is not required to exhaust judicial remedies by filing a petition for a writ of mandamus before filing a civil action." (*Taswell v. Regents of University of California* (2018) 23 Cal.App.5th 343, 362 (*Taswell*).) For this reason alone, the trial court erred in sustaining the entire demurrer for plaintiffs' failure to exhaust judicial remedies.

Second, the exhaustion of judicial remedies doctrine does not apply under either party's theory of the case. Plaintiffs have not contended that any administrative procedure was followed. Thus, based on the facts alleged, there was no "administrative decisionmaking process" requiring plaintiffs to "continue that process to completion." (*Runyon, supra,* 48 Cal.4th at p. 773.) Moreover, USC insists that any staffing decision at VHH was quasi-legislative, not quasi-judicial, so there is no indication that there were "prior administrative proceedings" that possessed

23

"judicial character." (*Y.K.A. Industries, supra,* 174 Cal.App.4th at p. 361.)

Nevertheless, USC argues, "As it relates to quasi-legislative action, courts are clear that a physician must first set aside the hospital's decision through ordinary mandamus, despite any disparate impact on that particular physician." In support of this statement, USC string-cites eight cases, including *Lewin*, *Mateo-Woodburn, Hay*, and *Abrams*, discussed above, none of which discusses exhaustion of other remedies or requires a plaintiff's challenge to take a particular form.

USC also cites *Centeno v. Roseville Community Hospital* (1979) 107 Cal.App.3d 62, in which the defendant hospital barred the plaintiff physician from using the radiology facilities at the hospital after contracting with an exclusive provider. The plaintiff physician filed a complaint seeking "a declaratory judgment, injunctive relief and damages." (*Id.* at p. 65.) After a bench trial, the court entered judgment for the hospital on all causes of action. (*Ibid.*) The Court of Appeal affirmed the judgment on the merits, and did not address any requirement that the physician first seek a writ of mandamus. USC also relies on *Unnamed Physician v. Board of Trustees of Saint Agnes Medical Center* (2001) 93 Cal.App.4th 607, which discussed a physician's failure to exhaust *administrative* remedies following a quasi-judicial hearing before filing a petition for writ of mandamus. Moreover, the court stated that the physician's "failure to exhaust administrative remedies, in and of itself, will not bar relief." (*Id.* at p. 621.)

It is well established that "a case is authority only for a proposition actually considered and decided therein." (*In re Chavez* (2003) 30 Cal.4th 643, 656.) The cases USC cites do not

24

support the position that, under the circumstances alleged in the FAC, plaintiffs were required to file a petition for writ of mandate rather than a complaint for damages. To the contrary, many of these cases addressed the plaintiffs' various causes of action, such as *Major*, in which the court addressed the plaintiffs' multiple theories, including violation of the Unruh Civil Rights Act, breach of contract, and interference with plaintiffs' business relationships—without requiring the plaintiff to bring a writ of mandate. (*Major, supra*, 71 Cal.App.4th at p. 1384.)

The parties disagree about the significance of the Supreme Court's opinion in *Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655 (*Fahlen*), especially in the context of plaintiffs' first cause of action under section 1278.5. In that case, the Supreme Court recognized its previous holdings that "persons filing damage suits authorized by certain whistleblower statutes—laws forbidding employer retaliation against workers who have reported fraud, danger, corruption, waste, or malfeasance—did not have to exhaust available administrative and mandamus remedies before seeking relief in court." (*Id.* at p. 660.) The court in *Fahlen* held that "when a physician claims, under section 1278.5, that a hospital's quasi-judicial decision to restrict or terminate his or her staff privileges was itself a means of retaliating against the physician 'because' he or she reported concerns about the treatment of patients, the physician need not first seek and obtain a mandamus judgment setting aside the hospital's decision before pursuing a statutory claim for relief." (*Ibid.*)

The physician plaintiff in *Fahlen* filed a complaint against the defendant hospital and others alleging that "defendants had caused his medical group (Gould) to fire him, had tried to run

25

him out of Modesto, and had terminated his staff privileges. . . . [T]he complaint sought reinstatement to the Hospital's medical staff; a declaration of defendants' bad faith; economic and noneconomic compensation, including lost wages; costs and attorney fees; punitive damages; and other appropriate relief permitted by law." (*Fahlen, supra*, 58 Cal.4th at p. 664.) In the context of an anti-SLAPP motion to strike under Code of Civil Procedure section 425.16, the defendants asserted that the plaintiff's "suit lacked probable merit because, when plaintiff timely failed to seek direct judicial review of the decision by a petition for mandamus, that decision became final, and plaintiff could not thereafter attack it collaterally in this action." (*Id.* at p. 665.)

The Supreme Court's review was limited to the following issue: "[W]hether, before a physician may commence a civil suit alleging that a hospital's quasi-judicial decision to terminate the physician's staff privileges was wrongfully retaliatory under section 1278.5, the physician must first prevail in an administrative mandamus proceeding to set the decision aside." (*Fahlen, supra*, 58 Cal.4th at p. 666.) The court held that "a successful mandamus attack on the decision is not a necessary condition to the filing of a section 1278.5 action." (*Ibid*.)

In reaching its conclusion, the court stated that in a whistleblower action, a "requirement that [a] plaintiff succeed in overturning an allegedly retaliatory, as opposed to remedial, administrative decision before filing a statutory action would very seriously compromise the legislative purpose to encourage and protect whistleblowers." (*Fahlen, supra*, 58 Cal.4th at p. 678.) The court noted that section 1278.5 allows a plaintiff the opportunity to "prove by a preponderance of evidence, to a

26

judicial fact finder, his or her distinct claim that there was a forbidden retaliatory motive" in the defendant employer's decision. (*Ibid*.) The court noted that requiring judicial exhaustion of an administrative decision before a whistleblower could file a lawsuit could, in some instances, "flatly contradict the provision of section 1278.5, subdivision (d)(1) that, for purposes of a civil whistleblower suit, there is a 'rebuttable presumption' of retaliatory motive if a discriminatory action is taken against a hospital physician, with the knowledge of the facility's responsible staff, within 120 days after he or she has submitted a protected grievance or complaint." (*Ibid*.) The court concluded that "a hospital staff physician who claims a hospital decision to restrict or terminate his staff privileges was an act in retaliation for his or her whistleblowing in furtherance of patient care and safety need not seek and obtain a mandamus petition to overturn the decision before filing a civil action under section 1278.5." (*Id.* at p. 687; see also *Taswell, supra*, 23 Cal.App.5th at p. 361 ["to require a whistleblower complainant under [section 1278.5] to exhaust judicial remedies by challenging an adverse administrative decision through a petition for a writ of mandamus 'would be contrary to the evident legislative intent.'"].)

Plaintiffs assert that under *Fahlen*, they were not required to exhaust judicial remedies before filing an action under section 1278.5. USC argues that the hospital's actions in *Fahlen* were quasi-judicial, not quasi-legislative, and the court in *Fahlen* stressed that it was addressing only the narrow issues before it. (See *Fahlen, supra*, 58 Cal.4th at p. 685 [noting several undecided issues relating to section 1278.5, and stating, "We stress, however, that all these matters are beyond the scope of

27

the narrow issue on which we granted review."].) We find that plaintiffs have the better argument here. *Fahlen* reasoned that the purposes of section 1278.5's protections for whistleblowers would be undermined by requiring the plaintiff to adhere to the very procedures that were being employed, as pretext, to retaliate against him. (*Id*. at p. 677.) Under this reasoning, there is no material difference between retaliatory actions against whistleblowers, whether deemed quasi-judicial or quasi-legislative.

Thus, we find no support for USC's contention that plaintiffs were required to bring their claims in a writ of mandate under Code of Civil Procedure section 1085, or that plaintiffs' claims were susceptible to demurrer because they were not asserted in that form. The trial court erred by sustaining the demurrer on this basis.

## C.    Individual causes of action

The trial court did not address USC's alternative argument that the FAC did not state facts sufficient to constitute the individual causes of action plaintiffs alleged. USC contends on appeal that even if plaintiffs were not otherwise barred from asserting their claims, the demurrer nonetheless should have been sustained because the FAC "fails to state a claim under any theory and cannot be cured by amendment." Plaintiffs contend that the FAC alleged sufficient facts to state causes of action under section 1278.5, the CFCA, and the UCL. Plaintiffs do not address their causes of action for wrongful discipline, intentional interference with prospective economic advantage, or negligence. We discuss the parties' arguments below.

28

### 1. *Section 1278.5*

Section 1278.5 states, "The Legislature finds and declares that it is the public policy of the State of California to encourage patients, nurses, members of the medical staff, and other health care workers to notify government entities of suspected unsafe patient care and conditions." (§ 1278.5, subd. (a).) To that end, section 1278.5 prohibits a health care facility from "discriminat[ing] or retaliat[ing], in any manner, against any patient, employee, member of the medical staff, or any other health care worker of the health facility because that person" has "[p]resented a grievance, complaint, or report to the facility." (§ 1278.5, subd. (b)(1)(A).) "Section 1278.5 does not explicitly limit the type of 'grievance, complaint, or report' for which retaliation is prohibited to one involving concerns about the quality of patient care," but "such a limitation is implicit in other provisions of the statute." (*Fahlen, supra*, 58 Cal.4th at p. 667 fn. 6.) Thus, to establish a prima facie case under section 1278.5, a plaintiff must show that he or she (1) presented a grievance, complaint, or report to the hospital or medical staff (2) regarding the quality of patient care and; (3) the hospital retaliated against him or her for doing so. (§ 1278.5, subd. (b)(1).)

Here, plaintiffs alleged that Alborzi complained about the defendants' financial arrangements between December 2017 and June 2018 by expressing "concerns regarding patient safety [and] the presence of illegally incentivized decisions about patient care by and among defendants." Plaintiffs alleged that Alborzi reported his concerns to VHH's chief executive officer in February and April 2018, and VHH's chief medical officer in May 2018. Plaintiffs alleged that in retaliation, defendants "stopped providing Plaintiffs with on-call panel consultations and

eventually terminated the infectious disease on-call panel."  In July 2018, the chief medical officer informed plaintiffs that the on-call panel had been dissolved.  Plaintiffs alleged that defendants' actions "resulted in loss of income to Plaintiffs." These facts are sufficient to support a cause of action under section 1278.5.

USC argues that plaintiffs "did not engage in any form of protected activity which could have triggered the statute," because the FAC does not include "allegations of any actual or threatened harm to any patient," and "the real, actual purpose for Dr. Alborzi's 'complaints' to [VHH] was merely to protect [plaintiffs'] bottom line."  Plaintiffs assert that Alborzi's complaints constituted protected activity because the "improper referral of patients . . . directly impacts quality of patient care."

Although plaintiffs' allegations regarding the impact of the alleged wrongdoing on patient care are not particularly robust, we find they are sufficient to meet the requirements of section 1278.5.  The FAC stated that Alborzi expressed "concerns regarding patient safety."  USC cites no authority, and we have found none, suggesting that concerns about patient safety must be alleged with particularity.

USC also asserts that section 1278.5 requires a showing of "adverse employment action," which plaintiffs did not allege because they "admit there was no change in their medical staff privileges or any demotion, suspension, termination, or disciplinary action imposed of any kind."  USC argues that plaintiffs' "discontent with the financial impact of the Hospital's decision to stop using the call panel cannot support a retaliation claim."  We disagree.

Section 1278.5 describes "discriminatory" action as including, but not limited to, "discharge, demotion, suspension, or any unfavorable changes in, or breach of, the terms or conditions of a contract, employment, or privileges of the employee, member of the medical staff, or any other health care worker of the health care facility, or the threat of any of these actions." (§ 1278.5, subd. (d)(2).) If "unfavorable changes," which may include the "threat" of unfavorable actions, may constitute discriminatory action under section 1278.5, then barring plaintiffs from receiving patient referrals could constitute discriminatory action.

The Supreme Court in *Shaw v. Superior Court* (2017) 2 Cal.5th 983 (*Shaw*) noted that the Legislature considered a variety of ways discriminatory action against a physician may occur, in light of the fact that physicians and hospitals do not always have employer/employee relationships. The court noted that a bill to amend section 1278.5 was proposed in 2007 "in order to extend to *physicians and surgeons* on the medical staffs of hospitals or other health care facilities the protections against discrimination and retaliation that the then-existing provisions of section 1278.5 afforded to *employees* of health care facilities." (*Id.* at p. 1000 [emphasis in original].) A related bill analysis by the Senate Judiciary Committee noted that according to the California Medical Association, "examples of actions a hospital can take to suppress physician-whistleblowers or to retaliate against them" included "underwriting the salary and/or practice expenses of a competing physician," "recruiting competing physicians to the community in the absence of a community deficit for that specialty," "establishing a medical practice administrative service company for selected physicians and charging below market rates so that the doctor keeps a higher

31

percentage of the collections and gains a competitive advantage," "inducing primary care physicians to refer patients to the hospital outpatient facility for tests, bypassing the specialist's office-based testing (e.g., imaging and cardiac tests)," or "developing investment partnerships with selected physicians (surgery center, MRI center) that provide lucrative annual returns on investment." (*Id.* at pp. 1001-1002.) "In apparent response" to these concerns, the Legislature amended the remedies in section 1278.5 to include "'any remedy deemed warranted by the court pursuant to this chapter or any other applicable provision of statutory or common law.'" (*Id.* at p. 1002; § 1278.5, subd. (g).) Thus, it appears that the Legislature intended section 1278.5 to encompass a broad array of discriminatory actions. The statute is not limited to revocation of privileges or specific disciplinary actions, as USC contends.

USC also argues that plaintiffs failed "to establish causation between any alleged adverse employment action and Dr. Alborzi's complaints." This argument is specious. Plaintiffs clearly alleged that dissolution of the on-call panel was retaliatory. Moreover, section 1278.5, subdivision (d)(1) provides that if "discriminatory action occurs within 120 days of the filing of the grievance or complaint" by the member of the medical staff, there is "a rebuttable presumption that discriminatory action was taken . . . in retaliation against" that staff member. USC argues, without citation to any authority, that plaintiffs are not entitled to this presumption because the FAC states that Alborzi was concerned about the financial arrangements for more than 120 days. This argument is unsupported and unpersuasive.

32

Plaintiffs therefore stated sufficient facts to support a cause of action for violation of section 1278.5.[2]

2. *California False Claims Act*

"The CFCA permits the recovery of civil penalties and treble damages from any person who knowingly presents a false claim for payment to the state or a political subdivision." (*State of California ex rel. Standard Elevator Co., Inc. v. West Bay Builders, Inc.* (2011) 197 Cal.App.4th 963, 973.) "The Legislature designed the CFCA "'to prevent fraud on the public treasury,'" and it "'should be given the broadest possible construction consistent with that purpose.'"" (*San Francisco Unified School Dist. ex rel. Contreras v. Laidlaw Transit, Inc.* (2010) 182 Cal.App.4th 438, 446.)

Government Code section 12653, part of the CFCA, states, "Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of his or her employment because of lawful acts done by the employee,

---

[2]For the first time in their reply brief, plaintiffs suggested specific ways they could amend their allegations that VHH's dissolution of the on-call panel was retaliatory. USC filed a motion to strike these portions of the reply, arguing that plaintiffs did not suggest these amendments in the trial court and it was inappropriate for plaintiffs to assert them for the first time in their reply brief. Plaintiffs filed an opposition and USC filed a reply. We deny USC's motion, but nonetheless disregard the portions of plaintiffs' reply brief suggesting new proposed factual amendments because they are not relevant to our analysis. (See Cal. Rules of Court, rule 8.204(e)(2)(C).)

contractor, agent, or associated others in furtherance of an action under this section or other efforts to stop one or more violations of this article." (Gov. Code, § 12653, subd. (a).) "[A] plaintiff alleging retaliation under the CFCA must show: '(1) that he or she engaged in activity protected under the statute; (2) that the employer knew the plaintiff engaged in protected activity; and (3) that the employer discriminated against the plaintiff because he or she engaged in protected activity.'" (*McVeigh v. Recology San Francisco* (2013) 213 Cal.App.4th 443, 455.)

USC asserts that plaintiffs cannot have standing because Government Code section 12653 is limited to "employees, contractors, or agents," and as a matter of law, plaintiffs were none of these. Plaintiffs assert that this argument is "patently absurd," because case law and "common sense" hold that an "individual working for or with an entity is either an employee or an independent contractor of that entity." Relying on competing case law, the parties argue about whether or not physicians with medical staff privileges can be classified as contractors or agents of a hospital as a matter of law.

We decline to address these legal issues in a vacuum. Plaintiffs failed to allege whether they were employees, contractors, or agents of any of the defendants. Without such an allegation, plaintiffs have failed to allege facts sufficient to show that they have standing to assert a cause of action under Government Code section 12653.

USC also contends that plaintiffs failed to allege facts to show any protected activity under the CFCA. USC asserts that plaintiffs' claims are insufficient because they "do not allege [plaintiffs] ever investigated alleged false claims or reported to

34

anyone that [VHH] had allegedly submitted a false or fraudulent claim for payment."

"[T]o constitute protected activity under the CFCA, the employee's conduct must be in furtherance of a false claims action. [Citation.] The employee does not have to file a false claims action or show a false claim was actually made; however, the employee must have reasonably based suspicions of a false claim and it must be reasonably possible for the employee's conduct to lead to a false claims action." (*Kaye v. Board of Trustees of San Diego County Public Law Library* (2009) 179 Cal.App.4th 48, 60; see also *Mendiondo v. Centinela Hosp. Medical Center* (9th Cir. 2008) 521 F.3d 1097, 1104 [the plaintiff was "engaged in protected activity if she reasonably believed that [the defendant] was possibly committing fraud against the government, and she investigated the possible fraud."].)

Here, plaintiffs alleged in the FAC that the defendants' financial arrangements violated state and federal law. In their briefing on appeal, they assert that such allegations are sufficient because "[v]iolation of either the Stark Law [42 U.S.C. § 1320a-7b] or the Anti-Kickback Law in connection with Medicare claims submitted is actionable under the False Claims Act." However, the FAC does not include allegations that these laws were violated with respect to Medicare claims. Although plaintiffs have alleged that they were attempting to address financial wrongdoing, they have not connected that wrongdoing with any alleged false claims. Thus, plaintiffs have failed to allege facts sufficient to state a cause of action under the CFCA.

Typically, "leave to amend is liberally allowed as a matter of fairness, unless the complaint shows on its face that it is incapable of amendment." (*City of Stockton v. Superior Court*

35

(2007) 42 Cal.4th 730, 747.) The cause of action is capable of amendment. Thus, if the trial court had reached this issue and denied leave to amend, it would have been an abuse of discretion. (See, e.g., *Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 320 ["If we see a reasonable possibility that the plaintiff could cure the defect by amendment, then we conclude that the trial court abused its discretion in denying leave to amend."].) Because the trial court erred by sustaining the demurrer on a different basis and never reached this issue, plaintiffs have not had an opportunity to amend this claim. On remand, therefore, we order the trial court to grant plaintiff leave to amend this cause of action.

3.     *Unfair Competition Law*

The UCL prohibits unfair competition, defined as "any unlawful, unfair, or fraudulent business act or practice." (Bus. & Prof. Code, § 17200.) The statute's "purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 949.) By defining unfair competition to include any "'*unlawful* . . . business act or practice' (Bus. & Prof. Code, § 17200, italics added), the UCL permits violations of other laws to be treated as unfair competition that is independently actionable." (*Ibid.*)

In their UCL cause of action in the FAC, plaintiffs referred to their general allegations that VHH and Concord entered into a below-market contract for hospitalist services, Concord shared ownership with Elevate, and Concord self-referred patients to Elevate. Plaintiffs alleged that these actions violated four laws: Business and Professions Code section 650, et seq., which prohibits commissions or other consideration as compensation for

36

referring patients (Bus. & Prof. Code, § 650, subd. (a)); Health and Safety Code section 445, which bars referrals of patients for profit; Welfare and Institutions Code section 14107.2, which bars kickbacks, bribes, or rebates relating to the referral of goods or services; and Business and Professions Code section 2273, subdivision (a), which bars "the employment of runners, cappers, steerers, or other persons to procure patients."

USC asserts that plaintiffs' "sole allegation that these statutes were violated by the Hospital is that it benefited from the financial arrangements by saving money on hospitalist services."  It argues that plaintiffs' "conclusory allegations" do not "support any claim that the Hospital improperly referred patients to a physician."

We find the allegations sufficient to state a cause of action. Plaintiffs alleged that VHH benefitted from the kickback scheme by saving money, and it entered into the contract for that purpose.  Plaintiffs were not required to allege, as USC asserts, "how and why the contract was below fair market value, or how the contract necessarily resulted in a fraudulent kickback scheme."  Particularized fact pleading is not required for a UCL claim.  (See *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 46-47.)

   4. *Causes of action not addressed in plaintiffs' briefs*

Plaintiffs' opening brief does not address their third cause of action for wrongful discipline, fourth cause of action for intentional interference with prospective economic advantage, or sixth cause of action for negligence.  Plaintiffs state in a footnote in their opening brief, "Because the trial court's ruling requires reversal as a matter of law, and that the trial court be ordered to instead deny the demurrer to the FAC in its entirety, this Court

37

need not reach the issue of whether Dr. Alborzi's [*sic*] other claims for wrongful discipline, interference with prospective economic advantage, and negligence adequately state a claim." They assert in a footnote in their reply brief that "[r]esolution of the sufficiency of the third, fourth, and sixth claims, which were never reached or discussed by the trial court, could be left for the trial court in the first instance if subsequently challenged by [defendants]."

USC asserts that plaintiffs have abandoned these causes of action by not addressing them on appeal. We agree. Although our review of a demurrer ruling is de novo, our review "'is limited to issues which have been adequately raised and supported in [appellants' opening] brief.'" (*WA Southwest 2, LLC v. First American Title Ins. Co.* (2015) 240 Cal.App.4th 148, 155.) Thus, where a demurrer is sustained without leave to amend, the appellant's failure to address certain causes of action in the complaint is deemed an abandonment of those causes of action. (*Ram v. OneWest Bank, FSB* (2015) 234 Cal.App.4th 1, 9 fn. 2.) We therefore find that plaintiffs have abandoned their causes of action for wrongful discipline, intentional interference with prospective economic advantage, and negligence.[3]

---

[3]In their reply brief, filed July 7, 2020, plaintiffs state that they "very recently" discovered that the June 2019 judgment included Concord and Elevate. They explain that they "inadvertently mistook the demurrer by Concord and Elevate as a second demurrer filed by" USC. They assert that judgment as to Concord and Elevate should be reversed, because the trial court's dismissal of the case in its entirety was inappropriate in response to demurrer by USC only. Because we reverse the judgment for the reasons expressed herein, we do not reach this issue. Nor do

38

## DISPOSITION

The judgment is reversed, and the cause is remanded with directions to enter a new order as follows: The demurrer is sustained without leave to amend as to plaintiffs' third cause of action for wrongful discipline, fourth cause of action for intentional interference with prospective economic advantage, and sixth cause of action for negligence. The demurrer is sustained with leave to amend as to plaintiffs' second cause of action for violation of Government Code section 12653. The demurrer is overruled as to plaintiffs' first cause of action for violations of Health and Safety Code section 1278.5, and fifth cause of action for violations of Business and Professions Code section 17200, et seq. Plaintiffs are entitled to recover their costs on appeal.

## CERTIFIED FOR PUBLICATION


COLLINS, J.

We concur:



WILLHITE, ACTING P.J.                          CURREY, J.

---

we express any opinion on the issues argued in Concord and Elevate's demurrer, which the trial court did not address. We deny Concord and Elevate's motion to strike plaintiffs' discussion of this issue from the reply brief.